UNITED STATES of America,
Plaintiff-Appellee,

v.

Samuel BRANTLEY, a/k/a "Pee Wee", Clifford Washington, Richard David Blackston, Alfred R. Canas, a/k/a "Sonny", James Murray, Carroll Barrett Zeigler, Defendants-Appellants.

No. 82–8270.

United States Court of Appeals, Eleventh Circuit.

May 23, 1984.

Davis Cohen, Federal Public Defender, Savannah, Ga., for Brantley and Washington.

Joel D. Bailey, Beaufort, S.C., for Blackston.

James H. Moss, Beaufort, S.C., for Canas.

Clyde M. Taylor, Jr., Tallahassee, Fla., for Zeigler.

Martin S. Jackel, court appointed, Savannah, Ga., for James Murray.

Melissa S. Mundell, Asst. U.S. Atty., Savannah, Ga., Sara Criscitelli, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before ANDERSON and CLARK, Circuit Judges, and DUMBAULD *, District Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Appellants Richard David Blackston, Samuel Brantley, Alfred Canas, James Murray, Clifford Washington, and Carroll Barrett Zeigler were indicted for various violations of the Comprehensive Drug Abuse Prevention and Control Act of 1970. 21 U.S.C.A. § 801 et seq. (West 1981).[1] After a jury trial in the United States District Court for the Southern District of Georgia, Washington, Brantley, Murray, Zeigler, and Blackston were convicted of possession of marijuana with intent to distribute (Count V); Blackston and Zeigler were additionally convicted of conspiracy to possess marijuana with intent to distribute (Count III); Canas and Blackston were convicted of conspiracy to import marijuana (Count II); and Blackston was convicted of engaging in a continuing criminal enterprise (Count I). Appellants raise numerous contentions on appeal. After careful consideration of these arguments, we affirm the convictions of all appellants except Murray and Blackston. We conditionally affirm Murray's conviction, subject to the outcome of a hearing on remand. We affirm Blackston's convictions on Counts I and V, but vacate his convictions and sentences on Counts II and III.

## I. FACTS

Between August 1980 and September 1981, appellant Richard David Blackston organized a series of ventures to smuggle marijuana into the United States. The activities generally originated in Savannah, Georgia, and the surrounding area, including the fishing community of Thunderbolt. Typically Blackston would arrange for shrimp boats to go to Colombia, South America, and take on multi-ton cargos of marijuana. The boats would then either rendezvous near the Bahamas with offloading boats destined for the United States, or return directly to the United States and be offloaded in a harbor in Frogmore, South Carolina.

In August 1980 Blackston arranged for co-indictee William Welch to take Welch's boat, the "Miss Mary," to Colombia to pick up marijuana and transport it to the Bahamas for offloading. Blackston enlisted appellant Alfred "Sonny" Canas to serve as base radio operator, in charge of communications with the boat. He also hired Frank Senior to serve as a crew member.[2] The "Miss Mary" sailed to Colombia in September 1980, took on 10 tons of marijuana, and then proceeded to the Bahamas to offload onto smaller boats that would transport the marijuana to the United States. While the "Miss Mary" awaited rendezvous with the smaller boats, however, the Coast Guard spotted the ship, and the crew dumped the marijuana overboard. The Coast Guard subsequently boarded the "Miss Mary," but found no evidence of marijuana.

In October 1980 Blackston arranged another trip to Colombia, this time on the "Lady Lynn," a shrimper owned by appellant Carroll Barrett Zeigler. Blackston paid Zeigler $4,000 for the use of the boat. Blackston hired Welch to captain the boat and Canas to serve again as base radio

---

* Hon. Edward Dumbauld, U.S. District Judge for the Western District of Pennsylvania, sitting by designation.

1. Thirteen other individuals were also named in the indictment. One was convicted, but does not appeal his conviction; two were acquitted; eight pled guilty before trial; and two remain fugitives. Those indictees who pled guilty provided damaging testimony against the others at trial.

2. Welch and Senior pled guilty before trial and testified for the government pursuant to a plea agreement.

operator. The "Lady Lynn" took on 40,000 pounds of marijuana in Colombia and off-loaded 96 bales onto smaller boats near the Bahamas, which then headed in the general direction of Florida. The crew of the "Lady Lynn" dumped the rest of the marijuana overboard and returned to the United States.

In May 1981 the shrimper "Lady Lynn" made a second trip to Colombia. Again Welch served as captain. Blackston provided money for the boat's supplies and served as base radio operator. After the "Lady Lynn" took on a load of marijuana in Colombia, it was stopped and boarded by the Coast Guard 50 miles off the coast of Colombia. The Coast Guard arrested the crew members and seized the ship.[3]

During this period, Blackston was busy managing other drug smuggling ventures as well. In December 1980 Blackston supervised the unloading of an unidentified boat that brought a load of marijuana to Frogmore, South Carolina. The marijuana was stored in a stash house in Frogmore. Blackston wholesaled the marijuana from that location. In January 1981 Blackston arranged to move the marijuana to Chatham County, Georgia. Appellant Zeigler and Michael Feltovic, a co-indictee who pled guilty and testified at trial pursuant to a plea agreement, drove a truckload of 9,840 pounds of marijuana to a location near Zeigler's father's house in Chatham County. In February 1981 Blackston arranged to move this marijuana from Chatham County to Effingham County, Georgia. This move was less successful; during the course of it state undercover agents arrested several conspirators, including Zeigler.[4]

Also in January 1981, Blackston arranged for the shrimp boat, the "Jeanette Murray," to bring a load of marijuana into the United States. Blackston gave appellant James Murray, owner of the boat, $50,000 to get the "Jeanette Murray" ready for the marijuana run. Murray hired an unindicted coconspirator to serve as crew member for $50,000 and gave him a $2,000 downpayment. Blackston hired appellant Clifford Washington to captain the boat, promising him $50,000. Appellant Samuel Brantley was the navigator, and Clarence Outler helped ready the boat for the run.[5]

Washington guided the "Jeanette Murray" from Thunderbolt, Georgia, to a point near the Anguilla Banks, where they picked up 510 bales of marijuana from a fishing boat. The "Jeanette Murray" proceeded to Frogmore, South Carolina, where the marijuana was unloaded. Appellant Zeigler helped unload and then took one truckload of the marijuana to Savannah. Washington and Brantley returned the "Jeanette Murray" to Georgia, after completely ridding it of any marijuana residue.[6]

## II. VENUE

Appellants Washington and Brantley claim that the government failed to prove that the offense charged in Count V, possession of marijuana with intent to distribute, took place in the Southern District of Georgia.

Criminal defendants have a constitutional right to be tried in the state and district in which the crime was committed. *United States v. Males*, 715 F.2d 568, 596 (11th Cir.1983). In reviewing an improper venue claim, this court must determine "whether, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the jury verdict ... the Government proved by a preponderance of the evidence" that the offense took place within the trial district. *United States v. White*, 611 F.2d 531, 535 (5th

---

**3.** The "Miss Mary" and "Lady Lynn" ventures formed the basis of Count II, which charged conspiracy to import marijuana.

**4.** This Effingham County episode formed part of the basis of Count III, which charged conspiracy to possess with intent to distribute.

**5.** Outler was convicted on Count V, but has not appealed his conviction.

**6.** The "Jeanette Murray" load helped form the basis for Count III, which charged conspiracy to possess with intent to distribute. The "Jeanette Murray" load also formed the basis for the Count V possession charge.

Cir.), *cert. denied,* 446 U.S. 992, 100 S.Ct. 2978, 64 L.Ed.2d 849 (1980).[7] "[T]here need not be direct proof of venue where circumstantial evidence in the record as a whole supports the inference that the crime was committed in the district where venue was laid." *United States v. Turner,* 586 F.2d 395, 397 (5th Cir.1978), *cert. denied,* 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 480 (1979).

■ Count V was based on violations of 21 U.S.C.A. § 841(a)(1) (West 1981), which prohibits possession of a controlled substance with intent to distribute, and 18 U.S.C.A. § 2 (West 1969), which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Sufficient evidence of either (a) actual or constructive possession or (b) the aiding and abetting of another's actual or constructive possession could therefore support a conviction under this count.

■ An aider or abettor may be tried in the district in which the principal committed the offense. *United States v. Kibler,* 667 F.2d 452, 455 (4th Cir.), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982); *United States v. Buckhanon,* 505 F.2d 1079, 1083 (8th Cir.1974); *United States v. Jackson,* 482 F.2d 1167, 1178–79 (10th Cir.1973), *cert. denied,* 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974); *United States v. Kilpatrick,* 458 F.2d 864, 868 (7th Cir.1972); *United States v. Bozza,* 365 F.2d 206, 221 (2d Cir.1966). Therefore, as appellants concede, if there was adequate proof

that Brantley and Washington aided and abetted another's actual or constructive possession in the Southern District of Georgia, venue was proper as to them under Count V.

■ An aiding and abetting offense occurs when a defendant "assist[s] the perpetrator of the crime while sharing in the requisite criminal intent." *United States v. Martinez,* 555 F.2d 1269, 1271 (5th Cir. 1977). Aiding and abetting has two components: " '[a]n act on the part of a defendant which contributes to the execution of a crime and the intent to aid its commission.' " *United States v. Smith,* 546 F.2d 1275, 1284 (5th Cir.1977) (quoting *United States v. Greer,* 467 F.2d 1064, 1069 (7th Cir.1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973)). *See United States v. Phillips,* 664 F.2d 971, 1010 (5th Cir.1981) (Unit B), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). "[I]n the context of a prosecution for aiding and abetting the possession of [marijuana] with intent to distribute, the government 'must introduce evidence connecting defendant with both aspects of the crime, possession and intent to distribute.' " *United States v. Schwartz,* 666 F.2d 461, 463 (11th Cir.1982) (quoting *United States v. Longoria,* 569 F.2d 422, 425 (5th Cir.1978)).

■ In this case, at least Zeigler and Blackston possessed marijuana from the "Jeannette Murray" in the Southern District of Georgia.[8] Brantley and Washington deny that they aided or abetted these possessions in any way, claiming that

---

7. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209. *Cf. Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982) (adopting as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit).

8. Zeigler had actual possession in Georgia of the marijuana he trucked to Savannah. Blackston, who was in the Southern District of Georgia, had constructive possession in Georgia of that same marijuana. The evidence at trial showed that Blackston constructively possessed the marijuana by virtue of his dominion and control

over it. *United States v. Davis,* 666 F.2d 195, 200 n. 7 (5th Cir.1982) (Unit B). Blackston also had control and thus constructive possession in Georgia of the marijuana that remained stashed in Frogmore, for as the district court noted, a party may constructively possess an object across state lines. *United States v. Blackston,* 547 F.Supp. 1200, 1206 (S.D.Ga.1982). *See United States v. Williams,* 503 F.2d 50, 52–53 (6th Cir.1974) (defendant in Cleveland constructively possessed suitcase in Chicago). *Cf. United States v. Davis,* 666 F.2d 195, 200 (5th Cir.1982) (Unit B) (venue in Georgia improper because no actual possession of drugs in Georgia and no constructive possession by defendant in Georgia of drugs in Florida).

any connection they had with this drug venture was severed after they offloaded the "Jeannette Murray" in Frogmore. These claims ring false. Brantley and Washington knowingly aided Blackston and Zeigler by supplying them with marijuana. Their shared criminal intent in Blackston's and Zeigler's possession with intent to distribute can be inferred from their own possession of the marijuana en route to South Carolina and the fact that they willingly engaged in a criminal venture that had as its ultimate object the distribution of the marijuana they brought to South Carolina.[9] These same facts connect Brantley and Washington with both possession and an intent to distribute. A further connection with the intent to distribute, which also refutes Brantley's and Washington's claims that their connection with the venture was severed after delivery, is that they had a continuing interest in the success of the entire venture. The interest was partly financial—each received $500 immediately after the voyage, but that was only a small portion of the sum that they were to receive ultimately [10]—and partly an interest in not getting caught. Blackston and Washington cannot insulate themselves from Blackston's and Zeigler's possession when their actions made that possession possible.

This case is very much like *United States v. Buckhanon*, 505 F.2d 1079 (8th Cir.1974). In *Buckhanon*, Arthur Buckha-

non was arrested at the Minneapolis airport with 29 ounces of heroin in his possession. Arthur's source for the heroin was his wife Katherine, who obtained the drug through a contact in Mexico and then supplied it to her husband. Katherine was charged under § 841 with possession with intent to distribute. The government's theory was that she had aided and abetted Arthur's possession and was therefore liable as a principal under 18 U.S.C.A. § 2. A jury properly instructed on this theory convicted Katherine. On appeal, she maintained that venue was improper in Minnesota because she had not been in the state during Arthur's possession. Noting that an aider and abettor may be tried where the principal committed the substantive crime, the court rejected Katherine's claim: "There is no question but that Arthur was in the District of Minnesota when he was apprehended in the crime of possession of heroin. There was adequate proof that Katherine aided and abetted him in that possession. Therefore, venue was proper." *Id.* at 1083.

■ Similarly, there was adequate proof in this case to allow the properly instructed jury [11] to find that Brantley and Washington aided and abetted Zeigler's actual and Blackston's constructive possession of marijuana in the Southern District of Georgia by obtaining the marijuana for them. Accordingly, venue in the Southern District of Georgia was proper.[12]

---

9. The aiding and abetting requirement of shared intent between the aider and abettor and the principal, sometimes referred to as the "community of unlawful intent," *see, e.g., United States v. Austin*, 585 F.2d 1271, 1277 (5th Cir.1978), is similar to the requirement in conspiracy cases that there be an "agreement." However, shared intent need not rise to the level of agreement. *United States v. Cowart*, 595 F.2d 1023, 1031 (5th Cir.1979). The fact that here Brantley and Washington, although not charged with conspiracy, were almost certainly conspirators in fact, emphasizes the strength of "the community of unlawful intent" between Brantley, Washington, Zeigler, and Blackston.

10. There was testimony at trial that Brantley and Washington were promised $50,000 for making the marijuana run on the "Jeannette Murray." 17 R. 227. That these payments were contingent on the success of the venture is demonstrated by Clarence Outler's reaction to the

Effingham County bust, which he thought involved the load of marijuana from the Jeanette Murray: "G.D. there goes some of our money." 18 R. 156.

11. The jury received a complete and proper aiding and abetting instruction. 21 R. 21–22.

12. Appellants Zeigler and Murray also contest venue as to Count V. Because Zeigler had actual possession of the Jeannette Murray marijuana in the Southern District of Georgia, venue was proper in his case. Venue was proper in Murray's case for the same reason it was in the case of Washington and Brantley. As owner of the "Jeannette Murray," Murray aided and abetted Zeigler's and Blackston's possession in the Southern District of Georgia. In addition, there was testimony indicating that Murray was in Savannah when his boat full of marijuana was in South Carolina. 17 R. 230–31. Therefore,

### III. SENTENCING

Appellant Blackston argues that he was improperly convicted and sentenced on Counts II, III & V. Blackston was convicted on Count I of continuing criminal enterprise under 21 U.S.C.A. § 848, on Counts II & III of conspiracy to import marijuana and conspiracy to possess marijuana with intent to distribute under 21 U.S.C.A. § 846, and on Count V of possession of marijuana with intent to distribute under 21 U.S.C.A. § 841. He was sentenced on Count I to 25 years, on Count II to 5 years, on Count III to 15 years, and on Count V to 15 years. The sentences on Counts I, II, and III are concurrent to each other and consecutive to the sentence on Count V; thus, Blackston's total sentence is 40 years.

■■■ Counts II, III, and V were the predicate offenses for the § 848 conviction, which required, among other elements, proof of "a continuing series of violations" of the relevant subchapters of Title 21. 21 U.S.C.A. § 848(b)(2).[13] This circuit interprets "a continuing series of violations" to mean three or more violations. *United States v. Graziano*, 710 F.2d 691, 697 n. 11 (11th Cir.1983); *United States v. Phillips*, 664 F.2d 971, 1013 (5th Cir.1981) (Unit B),

*cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).[14]

■■■ Blackston contends that the § 846 conspiracy and § 841 possession counts are lesser-included offenses of the § 848 continuing criminal enterprise offense and that we must therefore vacate both the convictions and sentences of these lesser-included offenses under *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); *United States v. Michel*, 588 F.2d 986, 1000 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); and *United States v. Johnson*, 575 F.2d 1347 (5th Cir.1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 454 (1979).

The government concedes that the § 846 offenses merge with the § 848 offense. Therefore, we vacate the convictions and sentences on counts II and III.[15]

■■■ Blackston's argument that he cannot be cumulatively punished for the § 848 count and the underlying § 841 offense runs aground on the shoals of *United States v. Phillips*, 664 F.2d 971 (5th Cir. 1981) (Unit B), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), and *United States v. Garrett*, 727 F.2d 1003 (11th Cir.1984). *Phillips* and *Garrett* hold

---

while in the Southern District of Georgia he had constructive possession of that marijuana.

**13.** The trial court charged the jury on Count I that the government must prove that Blackston committed the offenses charged in Counts II, III, and V as part of a continuing series of violations of the federal drug laws.

**14.** Because Blackston was convicted on all three counts, we need not decide an open question in this circuit, namely, whether an overt act in violation of the drug laws can be a predicate offense under § 848 when it is not the basis for a separate count and conviction. *See United States v. Raffone*, 693 F.2d 1343, 1349 n. 12 (11th Cir.1982) (leaving question open), *cert. denied*, ── U.S. ──, 103 S.Ct. 2094, 77 L.Ed.2d 303 (1983); *United States v. Michel*, 588 F.2d 986, 1000 n. 15 (5th Cir.) (same), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). We note, however, that *United States v. Johnson*, 575 F.2d 1347, 1357 (5th Cir.1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 454 (1979), indicates that such overt acts can constitute § 848 predicate offenses.

We necessarily decide another question previously undecided in this circuit, namely, whether conspiracies under 21 U.S.C.A. § 846 can be predicate offenses under § 848. *See United States v. Raffone*, 693 F.2d at 1349 n. 12 (leaving question open); *United States v. Michel*, 588 F.2d at 1001 (same). We now hold that they can be. *See United States v. Middleton*, 673 F.2d 31, 33 (1st Cir.1982). *Cf. United States v. Stricklin*, 591 F.2d 1112, 1124 (5th Cir.) (indicating that conspiracy offense may be "part of the foundation of the § 848 charge"), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). *But see United States v. Jefferson*, 714 F.2d 689, 702 n. 27 (7th Cir.1983) (only substantive offenses may serve as § 848 predicate offenses).

**15.** The law in this circuit is clear that both the sentences and convictions must be vacated under these circumstances. *United States v. Michel*, 588 F.2d at 1001; *United States v. Buckley*, 586 F.2d 498, 504–05 (5th Cir.1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979). Because Blackston's § 846 sentences are concurrent with his § 848 sentence, vacating his § 846 sentences does not reduce his total sentence.

in a subsequent § 848 prosecution, double jeopardy does not prevent reliance upon a prior § 841 conviction as a predicate offense. Those cases hold essentially that the § 841 offense and the § 848 offense are distinct for double jeopardy purposes. *See Garrett*, 727 F.2d at 1009; *Phillips*, 664 F.2d at 1009. In light of the "basic design [of double jeopardy] as a bar against repeated attempts to convict," *United States v. DiFrancesco*, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), if successive prosecutions (involving of course cumulative punishment) are not barred, it follows logically that double jeopardy does not bar cumulative punishment in a single prosecution for § 841 predicate offenses and the § 848 offense.[16]

## IV. ADMISSION OF PRIOR WRITTEN STATEMENT

■ Appellant Canas, who was convicted on Count II, objects to the admission into evidence of a prior written statement of government witness Frank Senior. Senior was charged in Count II with conspiracy to import marijuana. He and his lawyers prepared the statement after his arrest in New York, presumably in the hopes of striking a better plea bargain with the government and obtaining a less severe sentence from the trial judge. Subsequent-

**16.** We note that *Phillips* and *Garrett* are inconsistent with a First Circuit case disallowing subsequent prosecution of § 848 offenses and predicate § 841 offenses. *United States v. Middleton*, 673 F.2d 31, 33 (1st Cir.1982). The result in the instant case is inconsistent with the decisions of several other circuits barring cumulative punishment for § 841 and § 848 offenses in a single prosecution. *See United States v. Gomberg*, 715 F.2d 843, 851 (3d Cir.1983) (double jeopardy bars cumulative sentences for substantive predicate offense and continuing criminal enterprise); *United States v. Jefferson*, 714 F.2d 689, 701–03 (7th Cir.1983) (same); *United States v. Samuelson*, 697 F.2d 255, 260 (8th Cir.1983) (same); *United States v. Chagra*, 669 F.2d 241, 261–62 (5th Cir.) (Congress did not intend cumulative punishment for § 841 predicate offense and § 848 offense), *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982). *But see United States v. Mourad*, 729 F.2d 195, 203 (2d Cir.1984) (Congress intended cumulative punishment for § 841 and § 848 offenses).

We note also that *Phillips* and *Garrett* conclude that the § 841 predicate offense is not a lesser-included offense of § 848, without applying the test announced in *Blockberger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), notwithstanding that *Blockberger* is the established test. *Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). Application of the *Blockberger* test in *Phillips* and *Garrett* apparently would indicate that the § 841 predicate offense *is* a lesser-included offense of the § 848 count. In this regard, *Phillips* and *Garrett* are also potentially inconsistent with *United States v. Stricklin*, 591 F.2d 1112, 1123 (5th Cir.1979) (applying the *Blockberger* test to conclude that a § 846 conspiracy was a lesser-included offense of a § 848 count). *See also United States v. Michel*, 588 F.2d 986, 1001 (5th Cir.1979); *United States v. Johnson*, 575 F.2d 1347, 1354 (5th Cir.1978).

Having noted the foregoing inconsistencies, we observe on the other hand potential support for *Phillips* and *Garrett*. In the context of deciding the propriety of cumulative punishment in a single trial, the law is now clear that the *Blockberger* test is merely a rule of statutory construction to assist in ascertaining whether the legislative body intended cumulative punishment under the two statutes at issue. *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). In the context of successive prosecutions, as in *Phillips* and *Garrett*, it is true that *Blockberger* is the established test. *Brown v. Ohio, supra.* However, Supreme Court precedent does not unequivocally rule out a conclusion that the *Blockberger* test operates primarily as a rule of statutory construction even in the context of successive prosecutions. *See Brown v. Ohio*, 432 U.S. at 165, 97 S.Ct. at 2225 ("The Fifth Amendment double jeopardy guarantee serves principally as a restraint on courts and prosecutors. The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments"). More particularly, the Supreme Court has not yet definitively established the role of the *Blockberger* test in the context of a subsequent prosecution of a compound offense, based in part on a previous conviction of a predicate offense. *Whalen v. United States*, 445 U.S. 684, 710–11, 100 S.Ct. 1432, 1447–48, 63 L.Ed.2d 715 (1980) (Rehnquist, J., with Burger, C.J., dissenting). Although a plurality of four justices in *Jeffers v. United States*, 432 U.S. 137, 151, 97 S.Ct. 2207, 2216, 53 L.Ed.2d 168 (1977), apparently rejected an argument that the usual double jeopardy principles should not apply to complex crimes, both Justice Rehnquist and Chief Justice Burger were among that plurality, and their comment in *Whalen* leaves the issue in some doubt. If the *Blockberger* test operates only as a rule of statutory construction, the Supreme Court may well conclude that Congress intended that a subsequent § 848 prosecution could rely in part upon, as one of the predicate offenses, a previous § 841 conviction.

ly, Senior pled guilty. Senior's statement details his participation in the drug smuggling business; it includes an account of the "Miss Mary" and "Lady Lynn" loads, which were the overt acts charged in Count II. Senior testified about these same matters at trial and was cross-examined by the attorneys for Blackston, Zeigler, and Canas.

Canas argues that the government had no grounds to offer the statement into evidence. The district court found, however, and we agree, that the statement was properly admissible as a prior consistent statement under Fed.R.Evid. 801(d)(1)(B), offered to rebut implied charges of recent fabrication. Senior testified on direct examination that the destination of the "Miss Mary" and "Lady Lynn" loads was the United States. On cross-examination, Canas' attorney asked Senior to examine his statement, which he had testified on direct was a "full disclosure," 17 R. 96, to see if it said anything about the destination of the two loads. 17 R. 173. Senior conceded that it did not. In fact, however, the statement, on pages 14 and 15, did demonstrate that the destination was the United States. The district court therefore allowed admission of the statement to show that Senior's direct testimony was not a fabrication. 547 F.Supp. at 1214.

■ Canas further argues that admission of the entire 31-page statement was error because it was extremely prejudicial to him. The district court found that although the statement was lengthy, its complete submission did not prejudice Canas because his counsel had cross-examined Senior on the statements in the document. *Id.* We do not think that admission of the complete statement constituted an abuse of the trial court's "broad discretion regarding the admission of prior consistent statements." *United States v. Goodson,* 502 F.2d 1303, 1307 (5th Cir.1974). Although a trial court has discretion to exclude those parts of prior consistent statements that do not relate specifically to matters on which the defendant has been impeached, *United States v. Mock,* 640 F.2d 629, 632 (5th Cir.1981) (Unit B), it is not required to do so. *Cf. United States v. Lombardi,* 550

F.2d 827, 828 (2d Cir.1977) (when defense counsel challenges witness' credibility on basis of facts *absent* from prior statement, prior statement still admissible to prove consistency with other portions of testimony), *cited with approval in United States v. Hamilton,* 689 F.2d 1262, 1273 (6th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 218, 74 L.Ed.2d 174 (1982). Moreover, we find no merit in this assertion of error because, although Canas objected generally to admission of the statement, he did not request the excision of portions of the statement prejudicial to him.

■ Finally, Canas argues that allowing Senior's statement into evidence impermissibly placed a neat condensation of the government's case before the jury and in effect allowed the government's witness to accompany the jury into the jury room. Canas cites three cases that reversed narcotics convictions because the jury received drug evidence envelopes, on the fronts of which were printed forms filled out by narcotics agents that "present[ed] in officially impressive manner" capsule summaries of the government's case. *Sanchez v. United States,* 293 F.2d 260, 268 (8th Cir.1961); *United States v. Adams,* 385 F.2d 548 (2d Cir.1967); *United States v. Ware,* 247 F.2d 698 (7th Cir.1957). The error in those cases, however, was that the statements on the envelopes had either not been introduced into evidence, *Adams,* 385 F.2d at 550, or were inadmissible hearsay, *Sanchez,* 293 F.2d at 269; *Ware,* 247 F.2d at 700, and thus were not properly before the jury at all. The cases discussed the prejudicial effect of placing written condensations of the government's case before a jury in the course of determining that the error in giving the jury the statements was not harmless. Thus, these cases have no applicability to this case in which Senior's statement was not hearsay and was properly before the jury.

## V. EXTRINSIC INFLUENCE ON THE JURY

The appellants allege that an extrinsic influence on the jury denied them a fair

trial. After the trial was over, counsel for defendant Canas filed a motion to interview jurors. The motion was supported by an affidavit by Leroy Anderson, the boyfriend of juror Barbara Miller. Anderson swore that Miller had told him after trial that during jury deliberations about defendant James Murray, juror Angela Blige had informed the other members of the jury that she knew Murray's daughter and that Murray had "been in this kind of trouble before."

The district court held two *in camera* hearings to test the accuracy of this allegation and other allegations of extrinsic influence on the jury.[17] At the first hearing, Miller and Anderson testified, but the trial judge did not question them about juror Blige's remark. Defense counsel requested permission to question juror Miller on this subject, but the judge denied these requests. At this first hearing, the trial judge also denied the motion to interview the jurors about alleged improprieties.

At the second hearing, juror Blige testified and flatly denied having made the remarks attributed to her by juror Miller, although she admitted that she knew Murray's daughter. The court conducted the inquiry at this second hearing and allowed only written questions from the attorneys present. He refused to ask many of the questions submitted by counsel.

Following the two hearings, the trial court concluded that the defendants had failed to prove the allegation that juror Blige had brought into the jury room the extrinsic fact that Murray had been involved with drug smuggling before. It therefore declined to set aside the verdict on that ground.

 "A party claiming that an improperly influenced jury returned a verdict against him must be given an opportunity to prove that claim." *United States v. Forrest*, 620 F.2d 446, 457 (5th Cir.1980). In response to such an allegation, the trial

judge "must conduct a *full investigation* to ascertain whether the alleged jury misconduct actually occurred; if it occurred, he must determine whether or not it was prejudicial." *United States v. McKinney*, 429 F.2d 1019, 1026 (5th Cir.1970) (emphasis added), *cert. denied*, 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971). *See Port Terminal & Warehousing v. John S. James Co.*, 695 F.2d 1328, 1341 (11th Cir. 1983); *United States v. Phillips*, 664 F.2d 971, 999 (5th Cir.1981) (Unit B), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

 In concluding that it need not conduct a full jury investigation, *i.e.*, question all the jurors, to insure that the alleged extrinsic influence did not occur, the district court relied on *United States v. Sedigh*, 658 F.2d 1010 (5th Cir. Oct. 9, 1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982).[18] There the trial court received an affidavit at trial's end from a defendant's wife, swearing that an anonymous telephone caller had told her that a U.S. Marshal had informed two jurors that the defendant had a prior conviction. The trial court held an *in camera* hearing at which it questioned the wife and two Marshals under oath. The wife repeated her affidavit and the Marshals denied the allegations. On the basis of this hearing the trial court determined that there was no need for further investigation. The appeals court held that the trial court had not abused its discretion in refusing to conduct a full jury investigation because the allegation of extrinsic influence remained speculative even after the hearing. *Id.* at 1014.

 The *Sedigh* case is distinguishable from the case before us in two important respects. First, the allegation of extrinsic influence in *Sedigh* sprang from an anonymous source and was relayed by the defendant's wife. Neither of these facts

---

17. Although appellants also appeal the trial court's treatment of these other allegations, we find no reversible error in their disposition. Our discussion here relates only to the allegation involving juror Blige.

18. Because *Sedigh* was decided after September 30, 1981, and is a Unit A case, it is not binding on this panel. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc).

would inspire confidence in its validity. Here, juror Miller made the allegation on personal knowledge, lending more credibility to the allegation. Second, the trial judge in *Sedigh* questioned both the accuser and the possible wrongdoers about the allegation. His decision that the appellant had failed to prove a jury breach could logically have been based on a credibility choice. Here, the trial judge did not question juror Miller about juror Blige's alleged remark and refused to allow defense counsel to question Miller. His conclusion that appellants failed to prove jury misconduct was based entirely on juror Blige's testimony.

Binding precedent in this circuit holds that a juror's denials of misconduct are an insufficient basis upon which to reject a claim of misconduct, under circumstances similar to this case. In *United States v. Forrest*, 620 F.2d 446 (5th Cir.1980), a juror named Mrs. Watson confirmed to the trial judge in the middle of the trial that her niece had sought to influence her to acquit the defendants. Watson said that none of the other jurors was aware of the tampering attempt. The trial judge dismissed Mrs. Watson and replaced her with an alternate. The trial continued and resulted in a conviction. On appeal, this court held that the trial court's investigation into the occurrence of prejudicial contacts with the jury had been inadequate:

> Other than Mrs. Watson's statement that the others knew nothing about the contact, the record is silent as to the knowledge the other jurors might have had. Watson's testimony on this point is insufficient. We must be mindful of the fact that at the outset of the trial the judge told the jurors to avoid contacts with anyone involved with the case and not to discuss the case among themselves until they retired. Watson's natural disposition would be to claim she had complied with those instructions. *Only the other jurors can enlighten us properly on this subject.*

*Id.* at 457 (emphasis added). Thus, the court remanded for a full jury investigation to determine whether impermissible contacts with the other jurors occurred and, if so, whether they were prejudicial. *Id.* at 458.

 Similarly, juror Blige's testimony alone was an insufficient basis for concluding that she did not in fact make the remarks attributed to her by juror Miller. Blige's natural inclination would be to deny making those remarks. The jury was repeatedly admonished to consider only the evidence admitted in the case by the trial judge. 21 R. 3, 4. That also was part of the jurors' oath. *Id.* at 3.[19] Under these circumstances, the trial court abused its discretion in not inquiring further into this allegation of extrinsic influence. By preventing defense counsel from questioning Miller and the other jurors about this allegation, the trial court denied them the opportunity to prove their claim.[20]

 We need not remand this entire case, however. Although all the appellants raised this issue on appeal, taking the allegation of extrinsic influence as established, the jury misconduct was harmless as to all but appellant Murray. The extrinsic fact that Murray had been in this kind of trouble before pertained only to Murray and

---

**19.** We also note that there are latent questions about Blige's testimony that she did not tell the jury that she knew Murray's daughter. Arguably, if she did not tell the jury, juror Miller might not have known that Blige knew Murray's daughter. Of course, we express no opinion on juror Blige's credibility; we hold merely that the circumstances required a fuller investigation.

**20.** The trial court cited a number of cases for the proposition that "the appropriate procedure to be used at the hearing is left to the discretion of the trial judge." 547 F.Supp. at 1218 (citing *United States v. Sedigh*, 658 F.2d 1010, 1013 (5th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982); *United States v. Reyes*, 645 F.2d 285, 288 (5th Cir.1981); *United States v. Buchanan*, 633 F.2d 423, 427 (5th Cir. 1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 301 (1981); *United States v. Martinez*, 604 F.2d 361, 364 (5th Cir.1979), *cert. denied*, 444 U.S. 1034, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980)). Significantly, in all these cases, except for *Sedigh*, which is distinguished above, the trial court questioned *every juror* about the possible jury misconduct or outside influence at issue.

any spillover prejudice to the other defendants would have been negligible, particularly in view of the overwhelming evidence against these defendants. *See United States v. Winkle*, 587 F.2d 705, 715 (5th Cir.) (considering weight of evidence against defendants in determining prejudice of extrinsic evidence), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). Therefore, our finding of error in the investigation of the allegation of extrinsic influence does not affect the convictions of Blackston, Brantley, Washington, Zeigler, or Canas.

■ In regard to appellant Murray, however, "[w]e cannot doubt the prejudicial potential of a report—which the criminal defendant had no opportunity to challenge—that he had been in trouble before." *United States v. Howard*, 506 F.2d 865, 867 (5th Cir.1975) (remanding for full jury investigation of whether a juror had stated that defendant had been in trouble before and if so, whether defendant was thereby prejudiced). Accordingly, we remand for further investigation of Miller's allegation that Blige told the jury that Murray previously had been involved in drug smuggling. The district court should question all available jurors as to whether the incident occurred. If it appears that it did, the district court must determine whether there was a "reasonable possibility" of prejudice to Murray. *United States v. Savage*, 701 F.2d 867, 871 (11th Cir.1983). If the district court concludes that there was such a possibility of prejudice, Murray's conviction must be reversed and a new trial ordered. If, on the other hand, the extrinsic influence did not occur or there was no reasonable possibility of prejudice, Murray's conviction will stand.

In the interest of judicial economy, we follow the procedure utilized in *United States v. Renteria*, 625 F.2d 1279, 1284 (5th Cir.1980), and *United States v. Preston*, 608 F.2d 626, 640 n. 19 (5th Cir.1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980):

We declare as the law of this case that an appeal will lie to this court on any decision by the district court on remand which is adverse to [Murray]. Such appeal shall be handled, without the necessity for a new appeal, on the basis of the record now before us together with the record of the remand hearing and the district court's supplemental findings of fact and conclusions of law which shall be certified to this court and referred for further disposition to this panel. In the event of such an appeal, the clerk of this court will set a reasonable schedule for the filing of supplemental briefs without further order of the court.

*United States v. Renteria*, 625 F.2d at 1284.

## VI. FOURTH AMENDMENT CLAIMS

■ Appellants Canas, Blackston, and Zeigler contest the legality of the Coast Guard's stop, search, and seizure of the "Lady Lynn," and the introduction of evidence obtained against them as a result of that search.

On the night of August 21, 1981, the Coast Guard cutter "Steadfast" spotted a small vessel 50 miles from the Colombia coast. The "Steadfast" unsuccessfully tried to make radio contact with the vessel. A searchlight revealed that the vessel was the shrimper "Lady Lynn" out of the port of Savannah, Georgia. Suspicious because shrimping boats are not normally found off the coast of Colombia, the Coast Guard assembled a boarding party to make a safety and documentation check pursuant to 14 U.S.C.A. § 89 (West 1956). After the party boarded the "Lady Lynn," the "Steadfast" relayed to it a radio message from the Federal Intelligence Service in El Paso that the "Lady Lynn" might contain contraband. The boarding party nevertheless asked to inspect only the ship's documents, at which point a "Lady Lynn" crewmember escorted them to the pilot house. The route to the pilot house led through the ship's living quarters, where the boarding party observed numerous burlap bales of marijuana in plain view. The bales tested positively for THC. The Coast Guard thereupon seized the "Lady Lynn" and arrested its crew members. Information provided by William Welch, one of the crew members, led to the indictment in this case.

We agree with the district court that the boarding of the "Lady Lynn" was proper under 14 U.S.C.A. § 89(a),[21] which gives the Coast Guard plenary power to stop and board American vessels on the high seas to inspect for safety, documentation, and obvious narcotics violations without probable cause or reasonable suspicion. *United States v. Clark,* 664 F.2d 1174, 1175 (11th Cir.1981). Appellants argue that the Coast Guard's stated purpose in boarding the "Lady Lynn" was not just to conduct a safety and documentation inspection, but to insure "compliance with all applicable U.S. laws for the class of vessel." The two are clearly one and the same. Even if the boarding was also motivated by suspicions of narcotics violations, this does not " 'taint the validity of the safety and documentation inspection [under § 89(a) ].' " *United States v. Jonas,* 639 F.2d 200, 203 (5th Cir.1981) (quoting *United States v. Hillstrom,* 533 F.2d 209, 211 (5th Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977)); *see also United States v. Luis-Gonzalez,* 719 F.2d 1539, 1549 (11th Cir.1983) (upholding similar search).

■ Once on board, the Coast Guard found marijuana in plain view. The appellants. seem to suggest that the marijuana was found in a part of the boat (the crew's living quarters) that would not have been entered if the boarding party had confined itself to a document inspection. Trial testimony by Ensign Paul Sanchez, a member of the boarding party, clearly demonstrated, however, that the route to the pilot house containing the ship's documents led through the living quarters. 16 R. 337, 344. Therefore, there was no illegal search of the "Lady Lynn" for contraband. The trial court properly denied the appellants' motions to suppress evidence obtained as a result of the seizure of the "Lady Lynn." [22]

## VII. SUPPLEMENTAL JURY CHARGE

■ Appellants Murray, Brantley, Washington and Zeigler argue that they were denied their right to have an Article III judge rule on their objections to a supplemental jury charge given by a U.S. Magistrate in the district court's absence.

After the jury retired to deliberate, the trial court asked counsel if they had any objection to the magistrate receiving the verdict. The trial judge explained that he could not be in court that evening, but would return in the morning. There were no objections. The judge instructed counsel that if the jury requested recharging, the counsel "should get together on it, if you can. If you cannot, then they will just have to remain in there until I get up here. . . . Again, if there is any question of law see if you can't agree on it and find it where it is here and decide what needs to be done. And, I will check back with you in the course of the evening." 21 R. 37–38.

Later in the course of the evening, the magistrate informed counsel that the jury had requested a supplemental instruction

---

**21.** 14 U.S.C.A. § 89(a) (West 1956) provides:

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by

any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized.

**22.** Because of our disposition of this issue, we need not and do not evaluate the alternative ground adopted by the district court for denying Blackston's and Canas' Fourth Amendment claims, lack of standing.

and that he had made a response. He then had the clerk read the response and invited counsel to put their objections in the record. Apparently the magistrate then left the courtroom. Counsel put no objection in the record to the magistrate's having given the instruction.[23] Apparently, the trial judge did not return until after the verdict was rendered the next day.

On appeal, appellants rely on *United States v. De la Torre*, 605 F.2d 154 (5th Cir.1979). In *De la Torre*, the court held that "[i]t is the defendant's right to have an Article III judge rule on his counsel's objections and requests for instructions to the jury, at least absent waiver of that requirement by counsel." *Id.* at 156.

Under the circumstances of this case, we think that counsel waived the requirement. The trial court's clear instructions were that if counsel could not agree to a supplemental charge, the charge should not be made. Although the record indicates that the magistrate was at fault in not following these instructions, counsel neither objected nor made any effort to draw this error to the magistrate's attention. Although the magistrate left the courtroom after advising the attorneys of the supplemental charge, presumably he remained in the courthouse awaiting jury requests and the verdict and thus was available to hear any motions the attorneys might have made regarding the instruction. Nor did the attorneys attempt to locate the trial judge. Defense counsel had ample time to raise the issue at least with the magistrate inasmuch as the verdict was not rendered until late the next afternoon.

Even if there was no waiver and the defendants' right to have an Article III judge rule on the objections to the supplemental charge was violated, the error was harmless. As stated *supra*, note 27, we have reviewed the objections to the supplemental charge and find no merit in them. *See United States v. Boswell*, 565 F.2d 1338, 1341-42 (5th Cir.) (finding harmless error under similar circumstances), *cert.*

**23.** Counsel did object to the content of the instruction. We have reviewed those objections

*denied*, 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 110 (1978).

## VIII. CONCLUSION

We have reviewed the other issues raised by the appellants and find no reversible error. Therefore, we affirm the convictions of Brantley, Washington, Zeigler, and Canas. We conditionally affirm Murray's conviction, subject to a full investigation of the alleged jury impropriety involving juror Blige. We affirm the convictions of Blackston on Counts I and V, but vacate his convictions and sentences on Counts II and III.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED IN PART.

and find them meritless.