UNITED STATES of America,
Plaintiff–Appellee,

v.

Hal LONG, a/k/a Harry Long, Kathy A.
Kasch, a/k/a Kathy Kasch, a/k/a
Katherine Kasch, Defendants–Appel-
lants.

No. 88–7038.

United States Court of Appeals,
Eleventh Circuit.

Feb. 23, 1989.

Melissa A. Posey, Mobile, Ala., for Long.

Glenn L. Davidson, Mobile, Ala., for Kasch.

J.B. Sessions, III, U.S. Atty., Willie J. Huntley, Asst. U.S. Atty., Mobile, Ala., for U.S.

Before JOHNSON and CLARK, Circuit Judges, and VINSON *, District Judge.

CLARK, Circuit Judge:

James Brunson, Harry ("Hal") Long, Kathy Kasch and Sandra Ward were indicted on July 8, 1987 for conspiracy to commit an offense against the United States (dealing in counterfeit obligations) in violation of 18 U.S.C. § 371 and for possession of counterfeit money in violation of 18 U.S.C. § 474. A joint trial commenced on November 9, 1987 and on November 20, 1987, the jury returned a verdict acquitting James Brunson, acquitting Hal Long of the conspiracy but convicting him on the possession count, and convicting Kathy Kasch and Sandra Ward of both conspiracy and possession. Defendants Long and Kasch appeal their conviction and we affirm.

I. Factual Background

On April 17, 1987, a United States Secret Service agent received a tip from the Alabama police that counterfeit money was

being passed in Atmore, Alabama. After investigation, the police and special agents went to the residence of Hal Long. Long orally consented to a search of the premises. Following a fruitless search and after brief questioning, Hal Long led the agents to a tree where he had hidden some counterfeit money. Long agreed to accompany the agents to the police department for further questioning. At the station, Long was photographed and fingerprinted but no formal arrest was made. During his contact with the agents, Long made both oral and written statements.

The statements made by Long led the officials to others involved with the counterfeit money and their statements were also taken. Through these suspects, the officials uncovered equipment used for counterfeiting and $875,000 of counterfeit money buried near Atmore, Alabama. The investigators also found Kathy Kasch's fingerprints on a typewriter box recovered from the ground, and on several sheets containing bills that were found in the home of Oscar Werner in Alberta, Alabama.

The events unfolded from testimony given during Long and Kasch's trial. The counterfeit scheme, initiated sometime in October of 1986, was started with the idea of trading the counterfeit money for cocaine in South America, Florida and California. (R3–319–20). Ken Morris, one of the original co-conspirators, first approached defendant Kasch about assisting in the counterfeit operation because of her narcotic connections. Kasch agreed to participate. (R3–329–30).

The actual printing of the money began in February of 1987 in Tennessee, and the first counterfeit money became available for treatment in March of 1987. (R4–335). In early March, Morris took the printed money from Tennessee to Pensacola, Florida where, with the assistance of Kasch and others, the money was aged, cut, and tinted. (R3–339). Around this time, Morris asked Terry Michael Bowen, predomination.

---

* Honorable Roger Vinson, U.S. District Judge for the Northern District of Florida, sitting by desig-

nately an Alabama resident, (R3–157–58), if Bowen would be interested in participating in the counterfeit scheme. (R3–139). Bowen subsequently became involved in the scheme and secured some of the counterfeit money. (R3–155–56).

Sometime in the month of March, Morris received information that the Secret Service was attempting to locate him for questioning. (R4–351). After receiving this information, Morris, Bowen and another co-conspirator got all the money that had been treated and all the equipment connected with the printing of the counterfeit money, drove to an isolated area near Atmore, Alabama, and buried everything in three separate locations. (R4–353, 355). Shortly thereafter, Bowen turned himself in to the Secret Service in Alabama. (R3–173, 180). Later, on March 30, 1987, Morris and several others were arrested in West Palm Beach, Florida while attempting to make a drug deal using the counterfeit money. (R4–356–57).

Originally, Bowen was charged in the Southern District of Alabama with five counts in connection with the counterfeit money, but three of these counts were dropped when Bowen agreed to plead guilty to conspiracy and possession of counterfeit money (R2–136) and to testify at his co-conspirators' trial. (R2–197–98). In addition to the above information, Michael Bowen testified that he possessed counterfeit money in Alabama (R3–164–66, 178–79) and that he buried both the counterfeit money and the equipment to make the counterfeit money near Atmore, Alabama (R3–173–75). While Bowen himself was unable to recall the dates of these events, all the testimony given reveals that these events occurred during the month of March 1987. (R3–164; R4–958, 967). Finally, several other witnesses testified that Kasch was involved in making the counterfeit money in Pensacola, Florida.

## II. Hal Long

■ Hal Long appeals his conviction of possession of counterfeit obligations on two grounds. First, he argues that the special agents conducted an unlawful search of his trailer and shed, and of the surrounding property belonging to his mother-in-law. Second, Long alleges that the government officials obtained from him before his arrest certain oral and written statements in violation of his constitutional rights. In reviewing the district court's decision to admit evidence of the search and to admit the statements, we must make a factual determination of the voluntariness of Long's actions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 277, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973) (whether search voluntary is question of fact to be determined from the totality of the circumstances); *Beckwith v. United States*, 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976) (appellate court to make independent determination of voluntariness of elicited statements).

### A. *Improper Search*

There is no dispute that Long consented to the search of his and his mother-in-law's premises. Rather, Long argues that he gave such consent only because the officers alluded that the grand jury had enough information on which to base his arrest and because the officers threatened that, if necessary, they would return and "dig the place up." (Supp. R. 55, 57). Thus, Long argues, his consent was the result of coercion. Also, because he had the impression that the officials already had the authority to search the premises, Long argues that his consent was not knowing and voluntary. The government contends that there was no evidence of threat, force or promise of leniency; instead, Long voluntarily consented to a search and then voluntarily led the officials to the counterfeit money buried underneath the tree.

■ An examination of the record reveals that Long voluntarily consented to the search. Long testified that, while the officials were on the premises, he indicated to one of them a desire to cooperate in return for leniency and the official responded that he would do all that he could. (Supp. R. 57–59). Assuming that Long's testimony is true, Long was not promised

he would not be prosecuted. In fact, Long was the one who first insinuated that he would be willing to cooperate if the agent would help him out; it was not the agent who offered such an arrangement.

In addition, there is no evidence in the record of threat or force. The officials testified that without any request or promise on the part of the officers, Long led the agents to a mattress, out by an oak tree, under which the counterfeit money was buried. (Supp. R. 35–36). Even if the officers stated that they could come back and "dig the place up," such a statement does not amount to coercion. Long was free to force the agents to obtain a search warrant and, if at that time, he did not want "his whole place dug up," Long could have cooperated. We agree with the district court that the official's search was lawful.

### B. *Admissibility of Pre-arrest Statements.*

Long testified that when the agents came to the premises and asked Long to accompany them to the police station, he believed that he was under arrest. (Supp. R. 55, 67.) Long argues that being interrogated by five officials and then taken to the station restricted his movements enough to effectively place him in custody. Long also argues that while in "custody," his request to have an attorney was rejected and that his Miranda rights were "summarily" read to him only after being fingerprinted and photographed and only after giving the agents both oral and written statements. (Supp. R. 29). Finally, as the police returned Long to his home, one of the agents told Long that he did not know whether or not Long would be prosecuted but that if Long were cooperative, the official would make his cooperation known to the U.S. Attorney. (Supp.R. 41–42). Thus, Long contends that his statements were the result of coercion and that the failure of the agents to meaningfully inform him of his Miranda rights rendered his statements involuntary insofar as he did not knowingly and intelligently waive his constitutional rights in making them.

The record reveals that Long was not under arrest during his interrogation. In addition, the agents informed Long that he was not under arrest, that he did not have to speak with the agents if he did not wish, and that he could talk to a lawyer if he so desired. (Supp.R. 20–21). Before Long was asked to sign his written statement he was read his Miranda rights. (Supp.R. 39–40). Long voluntarily accompanied the agents to the police station and, at the completion of the station interview, Long was returned to his home. (Supp.R. 41). Finally, while the official did say that any cooperation would be brought to the attention of the U.S. Attorney, this assurance was given well after Long had signed a written statement. (Supp.R. 38, 42). Situations more questionable than this one have been found to be non-custodial interrogations. *See, e.g., United States v. Setzer,* 654 F.2d 354 (5th Cir.1981), *cert. denied,* 459 U.S. 1041, 103 S.Ct. 457, 74 L.Ed. 2d 609 (non-custodial interrogation when drug enforcement agent stopped defendant in airport and continued questioning the defendant even after defendant refused to be searched).

The government may undertake an interrogation of a suspect without the presence of an attorney and without informing the suspect of his Miranda rights so long as the suspect is not in custody. *Beckwith v. United States,* 425 U.S. at 347, 96 S.Ct. at 1616. A suspect is considered in custody if a reasonable person would believe that he were not free to leave; for example, if the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled. *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). None of these or similar factors were present in Long's case. Instead, it appears that Long was simply hoping for leniency. Under these circumstances, we find that Long's statements were constitutionally obtained and voluntarily given.

### III. Kathy Kasch

 Kathy Kasch also advances two arguments on appeal. First, she contends that the district court erred in granting the government's motion in limine to suppress any evidence that one of its witnesses had an abortion. Second, Kasch argues that the government failed to establish proper venue with respect to her possession charge.

### A. *Motion in Limine*

Kasch first argues that evidence that one of the government witnesses had an abortion was critical to Kasch's defense as it would have impeached the witness's testimony in two respects. First, it would have explained that the nature of Kasch's relationship with the witness centered around events other than the alleged counterfeiting conspiracy. Second, it would have explained that, as Kasch testified and the government witness denied, the witness did have occasion to spend the night at Kasch's house and therefore had occasion to borrow certain items later found in connection with the counterfeit money.

The government contends that evidence of the abortion was properly suppressed because it had little or no probative value to the defendant's case. On the other hand, such testimony could have prejudiced the jury and could have embarrassed the witness. The government also attempted to suppress any evidence of the witness's mental illness. The district court granted the motion to suppress evidence of the abortion but allowed the defense to present evidence of the witness's mental illness.

"Limitations on cross-examination are left to the sound discretion of the district court and as long as the restriction does not interfere with the defendant's right of confrontation, such limitations are permissible." *United States v. Carter*, 760 F.2d 1568, 1581 (11th Cir.1985) (citations omitted). Even without the government witness's testimony, there was ample evidence to convict Kasch on the conspiracy charge. Her fingerprints were found on a box and on several sheets found in Alabama. Two others involved in the conspiracy, Kenneth Morris and Mike Bowen, also testified as to Kasch's involvement. From this evidence alone, Kasch could have been convicted.

In addition, Kasch testified as to the material points she was trying to make about her relationship with the government witness. During trial she testified that she had a close personal relationship with the witness, that the witness often spent the night, and that during this time Kasch lent the witness her overnight bag and car so that the witness could visit a boyfriend (another co-conspirator). The government witness's testimony contradicted Kasch's. Evidence of the witness's mental illness was not suppressed. Apparently, the jury believed the witness, or at least it disbelieved Kasch's explanations of incriminating evidence. Evidence of the witness's abortion adds little to this equation. We find that the district court did not abuse his discretion in suppressing evidence of the abortion.

### B. *Improper Venue*

At the close of the government's case, Kasch moved for a judgment of acquittal as to the possession charge based on improper venue. This motion was denied by the district court. In indicting Kasch, the government accused Kasch of possession and custody of counterfeit notes in the Southern District of Alabama. Kasch contends that because she was never in Alabama, she never "possessed or controlled" the counterfeit money in that state. At most, Kasch argues, she could be found guilty of possession or custody of counterfeit money in Florida. Finally, she alleges that the government offered no proof that Kasch aided or abetted any of the people who traveled to Alabama, or that she assisted them in any way in placing this money within the Southern District of Alabama.

 Proving venue is an essential part of the government's case because criminal defendants have a right to be tried where the crime was committed. In reviewing improper venue challenges, the court must view the evidence in the light most favorable to the government and see whether

the crime took place in the district alleged. *United States v. Burroughs,* 830 F.2d 1574, 1580 (11th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988).

■ There is no dispute that venue was proper as to the conspiracy charge. In trying a defendant for conspiracy, venue is proper in any district where an overt act was committed in the course of the conspiracy. *United States v. Alvarez,* 755 F.2d 830 (11th Cir.1985), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985) and 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed. 2d 380 (1987). In this case, several of the co-conspirators went to Alabama sometime in March 1987 to bury the counterfeit money and equipment. Kasch does not object to venue on the conspiracy count.

Venue becomes more problematic in looking at Kasch's conviction for possession or custody of counterfeit obligations. There is *no* evidence that Kasch herself was ever in Alabama and the government does not so allege. Rather, it relies on the fact that several of Kasch's co-conspirators possessed the counterfeit money in Alabama, that Bowen pled guilty in the Southern District of Alabama to possession of counterfeit obligations, and that the counterfeit money and equipment was found there.

■ In *United States v. Brantley,* 733 F.2d 1429, 1434–35 & n. 8 (11th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985), this court held that venue for possession was determined by reference to the location of the defendants and not by reference to the location of the "possessed object." In the district court opinion of the same case, the district court reasoned that the offense of possession "may be tried in any district where the defendants were even temporarily located as long as the government proves ... that the defendants had knowing possession ... while there." *United States v. Blackston,* 547 F.Supp. 1200, 1206 (S.D.Ga.1982), *aff'd in part and vacated in part on other grounds, United States v. Brantley,* 733 F.2d 1429 (11th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985). Because Kasch was never in Ala-bama, she cannot be convicted based on the theory that she personally possessed the counterfeit obligations in the Southern District.

■ Nonetheless, Kasch can be convicted on the substantive count if the evidence shows that she aided or abetted a principal who had actual or constructive possession in Alabama. *United States v. Pearson,* 667 F.2d 12, 13–14 (5th Cir. Unit B, 1982). While aiding and abetting is a theory distinct from conspiracy, *id.* at 13, much of the same evidence that will support a conviction of conspiracy will also support a conviction of aiding and abetting. Thus, in *United States v. Stitzer,* 785 F.2d 1506 (11th Cir.), *cert. denied,* 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 44 (1986), we recognized that although one defendant did not have possession of narcotics in the proper district, he could still be convicted of the substantive count of possession through his co-conspirator's possession in that district. The defendant was found to have aided and abetted his co-conspirator's possession "by virtue of his participation in the conspiracy." *Id.* at 1519 n. 7. Likewise, in *United States v. Trevino,* 556 F.2d 1265 (5th Cir.1977), we acknowledged that "[m]uch of the same evidence that establishes the appellants' participation in the conspiracy also supports a finding that they aided and abetted [the principal] in the possession in which [the principal] was convicted." *Id.* at 1269.

In order to sustain a conviction for aiding and abetting, the evidence must show that the defendant "performed an act which contributed to the execution of the crime and that he intended to aid in the commission of the crime." *United States v. Russo,* 796 F.2d 1443, 1458–59 (11th Cir.1986). The government did not have to specifically allege aiding and abetting in Kasch's indictment; "assuming the evidence supports it, the accused can be convicted of aiding and abetting so long as the jury is instructed on it." *Id.* at 1458.

In *Russo,* defendant Pine was convicted of possession of narcotics in the Middle District of Florida because his co-conspirators possessed the narcotics in that area.

We found criminal intent on the part of Pine because he supplied the drugs to his co-conspirators in the Middle District of Florida and because he possessed the drugs himself in another district. We also found that this evidence showed willing participation in the commission of the crime. *Id.* at 1459. Similarly, in *United States v. Brantley*, 733 F.2d 1429 (11th Cir.1984), we affirmed the conviction of two defendants, Brantley and Washington, of the substantive offense of possession of narcotics by virtue of their co-defendants' possession. We found that they knowingly aided the co-defendants by supplying them with the drugs. We found criminal intent from their own possession in another district, from the fact that they willingly engaged in a criminal venture that had as its ultimate object the distribution of the drugs they brought from Columbia to South Carolina, from their continuing interest in the success of the entire venture and from their interest in not getting caught. *Id.* at 1435. Noting that "Brantley and Washington cannot insulate themselves from [their co-defendants'] possession when their actions made that possession possible," we held there was "adequate proof ... to allow the properly instructed jury to find that Brantley and Washington aided and abetted [the co-defendants' actual and constructive] possession in the Southern District of Georgia by obtaining marijuana for [these co-defendants]." *Id.*

In this case, Kasch participated in the conspiracy to deal in counterfeit obligations. She possessed the money in Florida and "treated" at least some of the counterfeit money that ended up in Alabama (as evidenced by her fingerprints on some of the money found there). She had an interest in the success of passing or selling the counterfeit money that she had made. Furthermore, she certainly shared an interest with her co-conspirators in not getting caught. The judge properly gave the jury an aiding and abetting instruction.[1] Kasch cannot insulate herself from

her co-conspirators' possession in Alabama when her actions in making the counterfeit money made that possession possible. Because an aider and abettor may be tried in the district in which a principal committed the offense, we find that venue for the possession charge was proper in the Southern District of Alabama. *United States v. Russo*, 796 F.2d at 1459.

Accordingly, the convictions of Hal Long and Kathy Kasch are AFFIRMED.

1. The jury received a complete and proper aiding and abetting instruction as well as a *Pinkerton* instruction (R.6:1317–1323). Because we find that venue was proper as to Kasch on an aiding and abetting theory, we do not address the government's argument that venue was proper under a *Pinkerton* theory.