UNITED STATES of America,
Plaintiff-Appellee,

v.

S. Sam CALDWELL,
Defendant-Appellant.

No. 85–8208.

United States Court of Appeals,
Eleventh Circuit.

Nov. 21, 1985.

See also 771 F.2d 1485.

William A. Morrison, Atlanta, Ga., for defendant-appellant.

Robert S. Stubbs, Atlanta, Ga., for plaintiff-appellee.

Before RONEY and ANDERSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

LEWIS R. MORGAN, Senior Circuit Judge:

Appellant S. Sam Caldwell appeals from his conviction below on six counts of mail fraud, one count of violating the federal statute prohibiting the destruction of a vessel upon the high seas for the purpose of injuring the vessel's insurer, and one count of conspiring to destroy that vessel. After the district court denied his motions for a new trial or for judgment of acquittal and imposed sentence, appellant filed a timely notice of appeal to this court. We have jurisdiction of this direct appeal from a criminal conviction, 28 U.S.C. § 1291 (1982), and we find no reversible error in the proceedings below.

## I. THE INDICTMENT

This case involves but one aspect of the continuing legal difficulties of S. Sam Caldwell, former Commissioner of the Department of Labor for the State of Georgia.[1] On February 6, 1984, Caldwell was named in 12 counts of a 19 count indictment returned by a grand jury sitting in the Northern District of Georgia.[2] The eight counts involved in this appeal, counts five through twelve, were severed and tried separately as to appellant Caldwell and co-defendant John Flanigan.[3] Counts five through nine charged Caldwell and his co-defendant with engaging in numerous fraudulent mailings in violation of the federal mail fraud statute, 18 U.S.C. § 1341. This grouping of counts involved what might be described as a fraudulent scheme to *obtain* insurance on the defendants' vessel, the *Our Way*, as

---

1. *See United States v. Caldwell,* 771 F.2d 1485 (11th Cir.1985); *United States v. Caldwell,* 605 F.Supp. 260 (N.D.Ga.1985); *United States v. Caldwell,* 594 F.Supp. 548 (N.D.Ga.1984). The parties have alluded to state charges arising out of Caldwell's activities as well.

2. The counts of the indictment not directly involved in this case are set forth below:

 Count I—Substantive violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.,* in relation to a group of Georgia Department of Labor employees.

 Count II—Conspiracy to commit the RICO violation.

 Count III—Conspiracy to commit extortion in violation of the Hobbs Act, 18 U.S.C. §§ 1951,

1952, in relation to obtaining campaign contributions for appellant's political campaign.

 Count IV—Conspiracy to violate the Hobbs Act regarding inducing contributions to help finance the refurbishing of the *Our Way.*

 Counts V to XII—*See infra* notes 4 and 5.

 Counts XIII and XIV—Perjury counts as to only defendant Nancy Sue Brown.

 Counts XV to XIX—Perjury counts as to only defendant Austin P. Coarsey.

3. *See United States v. Caldwell,* 594 F.Supp. 548 (N.D.Ga.1984) (order granting motions to sever and determining the order of trial of the various counts). The jury in this case was provided with a redacted indictment listing only counts five through twelve, renumbered as counts one through eight.

described below.[4] Count ten involved a fraudulent mailing to *recover* upon that insurance after the sinking of the vessel, and counts eleven and twelve charged that the defendants purposefully sank the vessel to obtain those insurance proceeds.[5]

## II. THE FACTUAL BACKGROUND—THE SCHEMES

The evidence adduced at trial, when viewed in the light most favorable to the prosecution and the jury verdict, *see, e.g., United States v. Davis*, 666 F.2d 195, 201 (5th Cir. Unit B 1982), established that appellant Caldwell along with co-defendants Jack Flanigan and William Shanks purchased the vessel, the *Our Way*, in 1978 from the insurance proceeds of a previous vessel that they had jointly owned. Although the defendants originally were partners in the purchase of the *Our Way*, a 33 foot Alglass Pacemaker sports fisherman, Flanigan apparently receded somewhat from that equal partner status sometime thereafter due to a lack of funds. At any rate, the defendants used the *Our Way* without incident until approximately September of 1980. The vessel was at that time moored on Crooked River in Camden County, Georgia, a brackish or salt-water waterbody that was subject to the tidal variations of the ocean. The *Our Way* apparently fell victim to unusual tide conditions while moored on Crooked River,

which, when coupled with the fact that she was tied too securely to the dock, caused her to literally roll on her side and sink. The defendants quickly undertook to have the vessel raised and refurbished, and they contacted numerous individuals to take part in that venture. One individual recruited for the project was Larry Mumford, an engine mechanic and race boat driver known to Caldwell from prior work he had done on Caldwell's boat. Mumford commenced with the process of removing the *Our Way*'s engines and proceeded over the next few months to rebuild and re-install them in the vessel.

At the time of this first sinking of the *Our Way*, the defendants had not obtained insurance for the boat. Subsequently, sometime during the renovation period, Caldwell confided in Mumford a plan to obtain insurance on the *Our Way*, to replace her expensive diesel engines with cheaper gasoline engines, and then to sink her for the purpose of obtaining the insurance proceeds. Mumford agreed to participate in the scheme and was given $1,500.00 to purchase the gasoline engines, with a promise from Caldwell of $5,000 more to be paid after the vessel was disposed of and the insurance proceeds were recovered. Sometime in 1981 during this refurbishing period, Caldwell hired Mumford to work for the Labor Department of the State of Georgia, although the real

---

4. These mail fraud counts briefly allege:

Count V—The mailing of a marine insurance application and Baxley Marine Survey between the Central Georgia Insurance Agency and the London Agency, between May 8, 1981 and June 1, 1981, in violation of 18 U.S.C. § 1341.

Count VI—The mailing of a Baxley Marine Survey between the London Agency and the Insurance Company of North America, from June 1, 1981 to June 8, 1981.

Count VII—The mailing of an Insurance Company of North America Application For Yacht Insurance, from the London Agency to Central Georgia Agency, between June 12, 1981 and July 11, 1981.

Count VIII—The mailing of the application in count VII from Central Georgia Agency to the London Agency, from July 11, 1981 to July 16, 1981.

Count IX—The mailing of the Count VII application from the London Agency to the Insur-

ance Company of North America on or about July 16, 1981.

5. Count X alleged that on or about June 15, 1982, Caldwell, Shanks and Flanigan caused a Loss Notice to be mailed from the Central Georgia Agency to the London Agency, the purpose of which was to obtain the proceeds from their sinking of the vessel the *Our Way*.

Count XI charged the three defendants with conspiring to "cast away and otherwise destroy" a vessel known as the "Our Way," with the intent to injure their three insurance carriers. 18 U.S.C. § 2271.

Count XII charged the defendants with the substantive violation of the federal statute prohibiting the sinking of a vessel for the purpose of obtaining the insurance proceeds. 18 U.S.C. § 2272.

purpose of that hiring was for Mumford to facilitate appellant's scheme to obtain the insurance proceeds.

Initially, an insurance agent by the name of Jimmy Connors was to provide the insurance, but he apparently did not provide the insurance as expected, which delayed the plan to sink the boat. In the course of dealing with Connors, Shanks learned, however, that a marine survey would be required in order to obtain the marine insurance. Inasmuch as Mumford was already involved in the plan to sink the *Our Way*, Caldwell discussed with him the details involved and jotted down some potential figures to be used for a survey. A marine survey was subsequently prepared valuing the *Our Way* at $60,000.00, which was typed by Caldwell's secretary and bore Mumford's signature, although he (Mumford) denied at trial having prepared or signed the survey himself. During this time, Caldwell also informed Mumford that he had located a replacement vessel, and that he might take the *Our Way* to Florida, dock it for a few months, and then sink it and report it stolen.

Shanks eventually procured insurance for the *Our Way* through an agent by the name of Billy Deason. The policy was issued in June of 1981, after the submission by Shanks of insurance applications and of a marine survey completed by Baxley Marine Company of Baxley, Georgia. This survey, which was identified at trial as government's exhibit Deason 2, bore the signature of Larry Mumford and stated, *inter alia,* that the present physical value of the *Our Way* was $95,000.00 as equipped. Counts five through nine of the indictment were based upon discreet mailings of these applications and the survey back and forth between Deason, as the insurance agent, and the insurance brokers through whom he acquired the insurance for the *Our Way. See supra* note 4. The

insurance policy was issued in the face amount of $95,000.00 covering loss due to named perils, which did not cover unseaworthiness of the vessel itself. In June of 1982, that policy was renewed.

Also in June of 1982, June 13, 1982 to be exact, Caldwell and Shanks embarked from the east coast of Florida en route to the Bahamas aboard the *Our Way*. Approximately 25 miles off shore, they encountered difficulties with the vessel. Earlier statements of Shanks and Caldwell's testimony at trial indicated that after noticing problems with the vessel, they checked below decks in the engine compartment and found a large amount of water entering the vessel at a rapid rate through an exhaust hose that had become disconnected. Caldwell testified at trial that the *Our Way* was so full of seawater and close to sinking by the time that they noticed the problem that there was not time to contact the Coast Guard, and he and Shanks almost immediately abandoned ship to a 15 foot boat they were towing behind the *Our Way*.[6] The *Our Way* sank in a matter of minutes, and Caldwell and Shanks then returned to shore in the small runabout, landing approximately in the area of Stuart, Florida. Shanks then notified the Coast Guard of the mishap.

After the sinking, Shanks submitted a Loss Notice seeking reimbursement from the insurance companies for the loss of the *Our Way*. That Loss Notice was mailed between the insurance brokers involved here and constituted the basis for the mail fraud claim contained in count ten. Sometime after this point, according to Mumford's trial testimony, Caldwell realized that the insurance companies were in possession of the fraudulent marine survey that had been submitted under Mumford's name. Caldwell therefore requested that Mumford meet him in Atlanta, Georgia, for

---

**6.** Caldwell's testimony on this point and Shanks' prior statement varied to a large degree as to the exact circumstances of the sinking. Shanks, for instance, indicated that he and Caldwell had

sufficient time to survey the situation, attempt to radio for help, and to return below deck to retrieve their luggage prior to abandoning the vessel.

the purpose of having Mumford sign another marine survey and he complied.[7]

### III. THE TRIAL

On November 2, 1984, appellant Caldwell was brought for trial on the eight severed counts described above along with co-defendant Flanigan. The other co-defendant, William Shanks, died prior to trial. The government proceeded to trial in this matter relying heavily upon the testimony of Larry Mumford, as bolstered by circumstantial evidence corroborating his testimony and casting suspicion as to the circumstances surrounding the refurbishing and second sinking of the *Our Way*. The prosecution also relied upon evidence of appellant's prior vessel ownership and insurance loss history to show, among other things, the relationship between the defendants and the existence of a prior loss history on Caldwell's part that was not reported in the applications for insurance.

Appellant's defense consisted primarily of his own testimony, which to a large degree contradicted that of Larry Mumford. Caldwell generally denied or had no recollection of Mumford's allegations concerning his involvement in the submission of a fraudulent marine survey or subsequently meeting with Mumford in Atlanta to prepare a new marine survey for Mumford's actual signature. He contended that he gave the original $60,000.00 survey to either Shanks or Mumford before it was submitted to obtain insurance in 1981, and that if it was altered to reflect a value of

the *Our Way* to $95,000.00, he had no knowledge of that fact. Caldwell also categorically denied any act or intention of sinking the *Our Way* at any time.

After the prosecution had presented its case and appellant his defense, a matter arose on the morning the case was to go to the jury regarding potential juror misconduct. Caldwell's trial counsel, Theodore S. Worozbyt, reported to the district court at an in chambers conference that earlier that morning he had received an anonymous telephone call from a man who claimed to have knowledge of improprieties by members of the jury panel. The caller informed Worozbyt that a juror by the name of Terri had been discussing the case with her fiancé, whose name was Martin Stone. The caller claimed that Stone had told him that Stone and Terri had been discussing the case, and that Terri and another juror had also been discussing the case. Allegedly the two jurors had decided that they were tired of hearing the evidence, that they knew Caldwell was guilty, and that they could not wait to "hang" him. The anonymous caller refused to give his name, and Worozbyt suggested that he call and relate this information directly to the judge's chambers. The caller did as Worozbyt advised, and the district judge instructed a member of her staff to take the call, with the caller being advised that his comments were being taken down by the judge's secretary.[8] The caller repeated essentially the same scenario as Worozbyt had related and he again refused to give his name. The

---

7. As Caldwell points out, the significance of this testimony is not entirely clear. If Mumford was a member of the conspiracy, it does not make sense that Caldwell would call him to Atlanta for the purpose of signing another survey identical to the first but for the signature, or for that matter, why Caldwell did not have Mumford sign the survey in the first place.

8. The conversation as taken down by the judge's secretary transpired as follows:

> CALLER: I would like for justice to be done. I am not for or against anyone. I just want things to go according to the law. A juror on the Caldwell case, name of Terri, has discussed this case with another juror and with her fiancé, and her fiancé said that he was quoting Terri and they had discussed the

case and both felt Caldwell was guilty and wanted to get it over with and the trial was boring. They had already determined in their mind that he was guilty.
> I have relayed this information to Caldwell's lawyer. I looked up his name in the paper. I just don't think they should be discussing it with another juror, saying things like that to other people. I did not want to get involved but felt that Judge Evans should be told, and if she would like to, she could poll the jury and find out what was said. I don't care about the outcome of the trial; however, I do care that someone who is sworn in as a juror discusses the facts with another juror. I felt she had to know prior to the case going to the jury.

district court related this second communication to counsel and after soliciting suggestions from counsel as to the proper manner of proceeding, the court interviewed the juror, whose full name turned out to be Terri Campbell, *in camera* without counsel present.

Juror Campbell essentially admitted to the court that she had discussed certain matters concerning the case with her fiance Stone, such as "characterizing" the attorneys involved, but she categorically denied discussing either the evidence or the guilt of any of the defendants.[9] She further represented to the court that she had no private discussions with any of the other jurors, and she reiterated her impartiality and ability to render a fair verdict. At that point, the court excused the juror to a waiting room, called counsel back into chambers, and immediately had the transcript of her discussion with Ms. Campbell read to counsel by the court reporter. Caldwell's counsel at that point moved to examine Campbell, Stone, and another juror allegedly seen by Flanigan's counsel having lunch with Campbell, and also objected to the court's *in camera* examination of juror Campbell without the presence of counsel. The district court denied those requests, expressing her belief that juror Campbell had responded truthfully to the court's inquiries and exhibiting concern that direct inquiry of any of the jurors by counsel might itself contaminate the jury panel. The judge then had a second *in camera* discussion with Campbell outside the presence of counsel at which time she merely instructed the juror to not discuss the matter with any of the other jurors and reaffirmed Campbell's impartiality. In the course of that discussion, Campbell indicated that she might know the identity of the anonymous caller.[10] Campbell was then returned to the jury panel, and the judge, as with the first meeting with Campbell, had the transcript of the second meeting provided to counsel by the court reporter at a later point in time.

The jury returned guilty verdicts as to appellant Caldwell on all eight counts tried in this case and as to Flanigan on only counts ten through twelve. After denial of his post-trial motions, Caldwell was sentenced to thirty-month prison terms on each of the counts to run concurrently, and he thereafter sought release on bond pending this appeal. The district court, finding no substantial question of law or fact in this appeal, denied that relief. *See United States v. Caldwell*, 605 F.Supp. 260 (N.D. Ga.1985). A similar request to this court by way of emergency motion was also denied.

## IV. THE ISSUES ON APPEAL

Appellant challenges four aspects of the proceedings below. First, he contends that the district court improperly handled the juror misconduct issue by failing to allow him and his counsel to be present at the

---

**9.** The relevant portions of the conversation between the court and juror Campbell follow:

> JUROR CAMPBELL: As far as the discussion that Martin and I had, there was never anything as whether he was guilty ever mentioned. The only thing we have talked about is I characterized the lawyers, which I should not have done, but there was nothing about evidence mentioned. I talked about the three lawyers, particularly Mr. Wallace. There was never any mention of evidence or whether he was guilty or not guilty. Martin as a matter of fact has never said to me whether he thought he was guilty or not guilty, and as far as sitting as an impartial juror, yes, I think I could very easily because I think if I was in anyone elses's shoes, I would want someone to look at nothing but the evidence.
> 
> \* \* \* \* \* \*

> JUROR CAMPBELL: I can assure you there was no discussion as to his guilt or innocence with anyone, even my parents. We just never talked about it.
> [Rec. 1581–83].

**10.** Juror Campbell made the following unsolicited statement to the court upon being informed that she would be returned to the jury panel:

> JUROR CAMPBELL: I know now who it was probably from because I know Martin had mentioned to me that he—his secretary's husband worked with the Labor Department. Now, I don't know what he has said to her, but that is probably—he has probably said something to her about me being on the trial because one of the ladies here was his old math teacher, so I think—
> [Rec. 1591].

two examinations of Ms. Campbell, and also by refusing to allow further inquiry to be made of the jurors and Stone. Second, appellant asserts that the court erred in refusing to allow the admission of an exhibit, identified at trial as exhibit C–11, which he contended supported his defense that Shanks altered the survey prepared by Caldwell and submitted it to the insurance companies involved without appellant's knowledge. Caldwell's third designation of error is directed to the mail fraud instruction given by the district court to the jury, and finally he challenges the lower court's construction of the 1984 Bail Reform Act in denying his request for bond pending appeal. Addressing these contentions *seriatim*, we find no reversible error.

### A. Juror Misconduct

Appellant Caldwell challenges the district court's handling of the anonymous caller's allegation of improper juror conduct on two grounds. First, he contends that by examining juror Campbell *ex parte*, the district court violated his due process right to be present at all stages of the trial and his parallel right under *Fed.R.Cr.P.* 43. In addition, appellant contends that the district court improperly restricted his ability to investigate the allegations of improper juror conduct by denying his request to further examine juror Campbell and to interview Stone and the other jury panel members.

Turning first to appellant's "right to be present" contention, we note that this circuit has recently reviewed the law in connection with *ex parte* communications by a trial court with a juror. In *United States v. Watchmaker*, 761 F.2d 1459 (11th Cir.),

*reh'g denied*, 766 F.2d 1493 (1985), the court confronted a situation where the district court had met privately with a juror who had requested removal from the panel for "personal reasons." Over defense objections, the trial court met with the juror in chambers outside the presence of counsel. After the court allayed the juror's fear of potential repercussions from continuing her jury service, she returned to the panel and defendants were ultimately convicted. In rejecting the defendants' attack on the verdict based upon their constitutional right to be present at trial, the *Watchmaker* court applied the Supreme Court's reasoning set forth in *United States v. Gagnon*, — U.S. —, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985):

> a defendant has a due process right to be present at a proceeding only when "his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." … In *Gagnon*, where the conference was only a "short interlude in a complex trial" at which the defendants' presence could not have been helpful and might have been harmful, their absence created no violation of due process.[11]

761 F.2d at 1466 (citations to *Gagnon* omitted). Under these principles, the *Watchmaker* court found that where the trial court took "great care" in framing his comments to the juror, where transcripts were made available to counsel, and where post-judgment motions provided ample opportunity to explore any possible prejudice to the defendants, there was no due process violation. These circumstances also rendered any technical violation of Rule 43 harmless error. *Id.*

---

11. *Gagnon* dealt with a factual situation where a juror noticed that during the course of the trial, a defendant was sketching the jurors. After the juror expressed his alarm, the judge held an *in camera* conference with the juror and defense counsel at which time the juror was assured that the defendant was merely an artist and that although the sketches were being made with no sinister motive, the practice would be discontinued. The *Gagnon* court found no constitutional right to be present at every interaction between the judge and a juror and found no constitutional deficiency arising solely from the fact of

communication between the judge and the juror. 105 S.Ct. at 1486. Furthermore, the court assumed for the purposes of analysis that there was a violation of Rule 43 due to the defendants' absence, but held that their failure to object at trial constituted a valid waiver of that right. Therefore, although *Gagnon* sets forth the relevant constitutional principles, we view *Watchmaker* as more closely aligned to this case and look to that decision for guidance in applying those principles to the instant factual situation.

Under the facts of the instant case, we find that the appellant's absence from the two short meetings with juror Campbell could not have affected his opportunity to defend himself. The court below immediately had the transcript of the first meeting read to counsel, and, as in *Watchmaker*, had the transcript of the second meeting provided to counsel sometime thereafter. Counsel clearly had an opportunity to provide input during the course of proceedings while the district court was attempting to handle the allegations of misconduct, and also to raise objections and seek further inquiry after the fact by way of subsequent motions. Finally, we see no prejudice, and perhaps even some benefit, to be gained by the defendants from their absence during the questioning of juror Campbell. Had the appellant actually been present and had counsel taken an active role in the questioning, it would have put the juror and the defendant in an adversarial posture, which could have an adverse affect on the juror. On the other hand, the appellant had little or nothing to gain from his mere presence, as the district court's procedure of reading the transcripts and soliciting suggestions as to the manner of proceeding provided all of the opportunity for participation that the appellant could have had short of direct questioning of the juror by his counsel. *See United States v. Yonn*, 702 F.2d 1341, 1345–46 (11th Cir. 1983) (transcript of *ex parte* communication reduces chance of prejudice, and absent any showing that such interviews prejudiced the defendants, their exclusion from the investigation is not reversible error), *cert. denied sub nom.*, 464 U.S. 917, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983). Consequently, we find that the appellant's absence from the proceeding did not result in prejudice to his due process rights, and any technical violation of Rule 43 was rendered harmless by the precautions taken by the district court.

As to Caldwell's contention that the district court improperly limited his ability to investigate potential juror misconduct, we note, as did the *Watchmaker* court, that the investigative procedure to be used in checking for juror misconduct falls within the discretion of the district court. *See also Yonn*, 702 F.2d at 1345. Numerous cases have addressed the issue of what circumstances call for investigation and what constitutes an abuse of discretion in failing to permit further inquiry by the parties into the allegations of juror misconduct. *See, e.g., Watchmaker*, 761 F.2d 1459; *United States v. Kelly*, 749 F.2d 1541 (11th Cir.1985), —— U.S.App.Pending ——; *United States v. Darby*, 744 F.2d 1508 (11th Cir.1984), *cert. denied sub nom.*, —— U.S. ——, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985); *United States v. Brantley*, 733 F.2d 1429 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); *United States v. Barshov*, 733 F.2d 842 (11th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 904, 83 L.Ed.2d 919 (1985); *Yonn*, 702 F.2d at 1341; *United States v. Sedigh*, 658 F.2d 1010 (5th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982).

Appellant Caldwell strongly argues that these decisions, especially *Yonn* and *Brantley*, require the finding that the district court should have permitted a full investigation into the juror misconduct issue here. *Yonn* involved a situation where one juror reported to the court that another juror had stated that the government's chief witness was a "pimp" and that she had already formed an opinion as to the defendants' innocence. The trial court interviewed each of the jurors individually and found that the reporting juror and four others had heard the remark. The court ultimately dismissed the offending juror and the reporting juror as well. 702 F.2d at 1344–45. *Brantley* was a situation where the defendants, after conclusion of the trial, submitted the affidavit of the boyfriend of one of the jurors, which stated that his girlfriend had told him that another juror had told the panel members during the course of the trial that she had known the daughter of one of the defendants and that the defendant had been in trouble all of his life. The trial court conducted two hearings on the matter. At the first, the

boyfriend and his girlfriend, the juror reporting the misconduct, were questioned, but the court refused to allow them to be questioned about the remark.[12] At the second hearing, the juror who knew the defendant's daughter testified, and she flatly denied having made the remarks attributed to her. 733 F.2d at 1438–39. The district court found the misconduct charge unsubstantiated, but on appeal the court remanded for further investigation, finding that the limited inquiry of only the juror who allegedly committed the misconduct was not sufficient to insure that the defendant had an opportunity to fully explore the allegation of impropriety. *Id.* at 1440.

A close reading of both *Yonn* and *Brantley* reveals, however, that they do not provide comfort for Caldwell's position here. *Yonn* in fact addressed only the issue of whether the district court committed reversible error in conducting its investigation of the jurors outside the presence of the defendants. Although the court approved of the district court's investigative efforts in attempting to ensure a fair trial, *see* 702 F.2d at 1345 n. 1, the issue of how extensive that investigation must be was not before the court, and the decision actually contains language reinforcing the district court's discretion "even to the initial decision of whether to interrogate the jurors." *Id.* at 1345. *Brantley* turned on the fact that the trial court improperly refused to allow a full investigation of all of the jurors based only upon a denial of wrongdoing by the accused juror, despite the allegation of extrinsic influence. 733 F.2d at 1440. We find it significant that the accuser in *Brantley* was not anonymous, and he was available for interview.

■ Examination of all of the cited authorities, in addition to *Yonn* and *Brantley*, leads us to the conclusion that the cases fall along a continuum focusing on two factors. At one end of the spectrum the cases focus on the certainty that some impropriety has occurred. The more specu-

lative or unsubstantiated the allegation of misconduct, the less the burden to investigate. *See, e.g., United States v. Barshov*, 733 F.2d 842 (11th Cir.1984) (district court did not abuse its discretion in refusing to conduct inquiry in light of allegations that juror's son may have influenced jury where the allegations were based upon mere speculation due to the son's close following of the trial proceedings and his "peculiar" behavior around the courtroom); *United States v. Kelly*, 749 F.2d 1541 (11th Cir. 1985) (where the trial court found the testimony of a member of the venire panel, stating that certain members of that panel who may have ended up on the jury were biased, to be "incredible" and not worthy of belief, there was no abuse of discretion in refusing to question jurors as to their bias). At the other end of the continuum lies the seriousness of the accusation. The more serious the potential jury contamination, especially where alleged extrinsic influence is involved, the heavier the burden to investigate. *Brantley* stands for this proposition, as do *United States v. Forrest*, 620 F.2d 446 (5th Cir.1980) (failure to question jurors concerning their knowledge of an alleged tampering attempt, in addition to the juror who was the object of the attempt, required further investigation), *aff'd after remand*, 649 F.2d 355 (1981), and *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981) (district court's collective investigation of jury panel as to possible discussions of the case among themselves to investigate their exposure to tampering attempt or publicity surrounding that attempt was sufficient, although presumption of prejudice arises where a showing of outside influence is made), *cert. denied sub nom.*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). In attempting to peg this case into a slot among these juror misconduct decisions, we find the non-binding decision of the Fifth Circuit in *United States v. Sedigh*, 658 F.2d 1010 (5th Cir. 1981), *cert. denied*, 455 U.S. 921, 102 S.Ct.

---

**12.** It is not clear from the *Brantley* opinion what the purpose of this first hearing was. It would seem that the very reason for holding that hearing would have been to question the juror and her boyfriend about the allegation of the improper remark.

1279, 71 L.Ed.2d 462 (1982)[13] to be most analogous to the instant case.

In *Sedigh,* the wife of one of the convicted defendants testified that she had received an anonymous telephone call telling her that a marshal had informed two of the jurors that her husband had a prior conviction for conspiracy. The district court held an *in camera* hearing at which both the defendant's wife and the two marshals were questioned. The wife repeated her affidavit testimony, and the two marshals categorically denied her contentions. The *Sedigh* court concluded that where the allegations remained speculative there was no need to inquire further than was done there. 658 F.2d at 1014. Although the court in *Sedigh* did not amplify its reasoning, as the *Brantley* court observed, there were two significant aspects to that decision. First, the informant in *Sedigh* was anonymous. Second, in *Sedigh* both the accuser and the accused were questioned about the alleged wrongdoing. In determining that no further inquiry was necessary, the district court in *Sedigh* was faced with a credibility choice. *See Brantley,* 733 F.2d at 1439–40 (discussing *Sedigh* ).

We find the circumstances of the instant case to fall within the mold of *Sedigh.* Here, the initial allegation of misconduct was similarly speculative and unreliable, the accusation coming from an anonymous caller. Although that caller contacted the district court's chambers in addition to Mr. Worozbyt, the anonymity of the call in our minds simply creates no burden to investigate. To require any investigation in the face of such unreliable accusations would place an imposing burden on the district court to risk jury contamination from the investigative process itself, when the court has no basis whatsoever to adjudge the reliability of the initial accusation. Although the lower court here did undertake a limited inquiry in an abundance of caution, the court did no more than the court in *Sedigh* in determining that as a matter of credibility, juror Campbell was to be believed over the statements of an anonymous caller who did not see fit to give his name to the court or to otherwise substantiate his serious allegations of wrongdoing.

Furthermore, we find nothing in the record to support Caldwell's contention that juror Campbell corroborated the anonymous tip in any relevant respect.[14] Campbell merely stated to the court that she had described some of the attorneys to her fiance, but she steadfastly denied any discussion of the evidence or that any conclusions as to guilt or innocence had been made on her part. While we would certainly not encourage such conduct, we nevertheless do not feel that this statement is of such magnitude that the juror corroborated any significant aspect of the misconduct allegation. Given the superior vantage point of the district court from which to evaluate the juror, we find no basis to conclude that the district court abused her discretion in failing to pursue the matter further. *Cf. United States v. Williams,* 716 F.2d 864,

---

**13.** As a Unit A, Former Fifth Circuit case decided after October 1, 1981, *Sedigh* is not binding in this circuit. *See Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982).

**14.** The anonymous tipster was corroborated no more than *any* anonymous caller with knowledge of either the case or an individual juror would likely to be corroborated. To hold the "corroboration" encountered here to be sufficient to require further inquiry would make the district court hostage to virtually any allegation of wrongdoing. For example, a party disenchanted with the course of a trial could easily uncover information about a juror, such as the name of a juror's fiancé and his place of employment, add an anonymous allegation of improper discussion of the case that would provide a particularly sinister air to the matter, and then fully expect the juror to "corroborate" portions of the allegations. The same could be said for the fiancé's secretary, who might happen to know that her boss's fiancé was sitting on a jury and whose husband at one time also worked for one of the defendants in that trial. We need not speculate as to other possibilities and we in no way hypothesize as to what occurred in this case. But the point is that the "corroboration" encountered here in no way corroborated the allegations of "misconduct," but merely collateral matters such as the name of juror Campbell's fiancé. Such "corroboration" by an anonymous source gives rise to no further duty to investigate.

865 (11th Cir.1983) ("district court was in the best position to determine whether the facts reflected by counsel's statement as to the jury's discussion of the case prior to submission could be cured from error by instructions ..."), *cert. denied,* —— U.S. ——, 104 S.Ct. 2660, 81 L.Ed.2d 366 (1984).

Although we find no reversible error as to either the appellant's absence from the investigation or the failure to allow further investigation, we nevertheless do not wholeheartedly embrace the actions of the district court here. The safer course may well have been to allow the defendants to observe the inquiry of the juror, even if they were not allowed to participate. *See Yonn,* 702 F.2d at 1345. Furthermore, the entire controversy over the alleged misconduct of Ms. Campbell might have been avoided by the use of the remaining alternate juror, who was still available at the time this controversy arose on the morning the case was to go to the jury. We nevertheless recognize that such decisions must be made by the district court during the "heat of the fray," and although the proceedings below may not have been perfect, any error was harmless error.

### B. *Failure To Admit Exhibit C–11*

At trial, appellant's primary defense to the mail fraud counts was that he lacked knowledge of any fraud perpetrated in relation to the *Our Way,* and that any such fraud must be attributed to others associated with the vessel. As explained earlier, counts five and six of the indictment charged Caldwell with mail fraud in regards to the mailing of a fraudulent "Baxley Marine Company Marine Survey" in an effort to obtain insurance on the *Our Way.* The government's theory on the mail fraud counts was that government exhibit Deason 2, which the district court admitted into evidence, was the Baxley Marine Survey named in the indictment and that it contained numerous fraudulent representations, not the least of which was the fact that it was not prepared by Larry Mumford as it stated. Deason 2 placed the value of the *Our Way* at $95,000.00. That exhibit

was identified as the survey submitted to the insurance company by Shanks during his efforts to obtain insurance on the *Our Way,* such surveys usually being required to receive coverage under a wet marine policy.

Caldwell asserted at trial that he and Mumford prepared a marine survey setting the value of the *Our Way* at $60,000.00 and that he then gave the survey to either Mumford or Shanks, that being the last time he saw it. To bolster this contention, he submitted and had introduced exhibits C–9 and C–10, signed and unsigned copies of a Baxley Marine Survey valuing the *Our Way* at $60,000.00 and carrying Larry Mumford's name.[15] He also sought to introduce exhibit C–11, which was identical to the last two pages of C–9 and C–10, except for some handwritten alterations, one of which changed the value of the vessel to $95,000.00. The original marine survey submitted to the insurance companies, government exhibit Deason 2, incorporates the handwritten alterations found in exhibit C–11. Caldwell's theory, therefore, was that he prepared a correct survey (exhibit C–9) that Shanks later altered without his knowledge (exhibit C–11), resulting in the submission of the survey named in the indictment (exhibit Deason 2).

To establish a foundation for the admission of exhibit C–11, Caldwell testified that the two pages comprising exhibit C–11 originated from the survey he and Mumford prepared, exhibit C–9, and that the handwritten alterations were made in Shanks' handwriting. He stated that he had obtained exhibit C–11 from two attorneys in Jesup, Georgia, shortly before trial. The attorneys had previously represented Shanks, and when called to testify, they asserted that Shanks told them that his insurance agent had recommended the change to $95,000.00 in insurance coverage due to the minimal difference in premiums on that increased amount over $45,000.00. One of the attorneys also testified that according to Shanks the exhibit C–11 sur-

---

**15.** The government did not object to the introduction of exhibits C–9 and C–10.

vey had been prepared prior to the submission of the application for insurance in the spring of 1981.

At the time exhibit C–11 was offered, the government objected on both grounds of hearsay and lack of authenticity. As we understand the district court's ruling, the hearsay objection was overruled based upon the court's finding that the material contained in C–11 did not constitute an "assertion." *See Fed.R.Evid.* 801. The court, however, sustained the government's authenticity objection. Although the ruling is not entirely clear from the record, apparently the court felt that for appellant to establish the authenticity of C–11, it was necessary to present evidence sufficient to indicate that the document was prepared prior to the submission of the ultimate survey (exhibit Deason 2) to the insurance companies. The court was concerned with potential fabrication of the document to bolster Caldwell's defense. The district court found an insufficient basis in this record to place the origin of exhibit C–11

prior to the application for insurance and refused to admit the document into evidence.

Federal Rule of Evidence 901(a) provides that the requirement of authenticity or identification, as opposed to admissibility, is met "by evidence sufficient to support a finding that the matter in question is what its proponent claims." The decision of whether or not a particular piece of evidence has been appropriately identified falls within the discretionary function of the district court, and that determination will not be disturbed on appeal absent a showing that there is "no competent evidence in the record to support it." *See United States v. Koziy,* 728 F.2d 1314, 1321 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984); *Bury v. Marietta Dodge,* 692 F.2d 1335, 1338 (11th Cir.1982), *reh'g en banc denied,* 701 F.2d 947 (1983); *Meadows and Walker Drilling Co. v. Phillips Petroleum Co.,* 417 F.2d 378, 382 (5th Cir.1969).[16] Authen-

**16.** Each of these decisions dealt with evidence that was *admitted* over authentication objections, although *Meadows* was couched in terms of "whether or not" it was authenticated. The instant case, however, deals with the *exclusion* of evidence. For that reason, this "no competent evidence" formulation of the abuse of discretion standard is a cumbersome mechanism to deal with. In cases where contradictory evidence has been submitted, there may be affirmative evidence supporting the lower court's decision to exclude the proffered evidence based upon its finding of insufficient authenticity. *See, e.g., Wright v. Redman Mobile Homes, Inc.,* 541 F.2d 1096, 1097–98 (5th Cir.1976) (trial judge acted within his discretion in excluding photographs from evidence for lack of authenticity where there was testimony indicating that the photographs did not correctly portray the scene of the accident in question). But to require such a showing in all cases where proffered evidence is excluded would improperly shift the burden from the proponent of the evidence under Rule 901 to establish authenticity to the opposing party to come forward with affirmative evidence proving no authenticity. For instance, to require competent evidence of non-authenticity in this case would require the government to demonstrate evidence in this record that exhibit C–11 was produced after the spring of 1981. Therefore, in some cases such as here where there is no such contradictory evidence, the inquiry may really be whether the proponent's evidence of authenticity, when

viewed alone, established a sufficient basis for admission of the proffered evidence. If so, the lower court abused its discretion in refusing to admit the proffered evidence for lack of authenticity. In other words, for there to be "no competent evidence" supporting the court's determination that the proffered evidence has not been authenticated, there must be competent evidence that the proffered evidence *was* sufficiently authenticated.

Professor Moore, quoting from *United States v. Sutton,* 426 F.2d 1202, 1207 (D.C.Cir.1969), frames the inquiry as follows:

The applicable test to determine error [in admission] is not whether the evidence of genuineness induces a belief beyond a reasonable doubt that the document is the handiwork of its alleged drafter, but whether, if it is uncontradicted, a reasonable mind might—though not necessarily would—fairly conclude favorably to the fact of authorship.

11 *Moore's Federal Practice* § 901.04 (1976 & 1985). As he points out, this formulation makes clear that the trial judge must merely act to ensure that there is sufficient evidence of authenticity, but the ultimate determination of whether to believe that evidence is left for the jury.

Consequently, even though exhibit C–11 was excluded in this case, we view our task as to determine whether there was competent evidence from which a reasonable mind could have concluded that that exhibit had been pre-

tication or identification under rule 901 merely involves the process of presenting sufficient evidence to make out a *prima facie* case that the proffered evidence is what it purports to be. Once that *prima facie* showing has been made, the evidence should be admitted, although it remains for the trier of fact to appraise whether the proffered evidence is in fact what it purports to be. *See* 5 *Weinstein, Weinstein on Evidence,* 9.01(a)[01].

■ The only testimony presented at trial as to the date of the preparation of exhibit C–11 came from one of the attorneys from Jesup who represented Shanks. That testimony primarily was brought out by the prosecution on cross-examination regarding the attorney's direct testimony, as set out in the margin.[17] Our review of the record reveals no other evidence as to the date of preparation of exhibit C–11, nor have counsel directed to us any other such evidence.

Assuming that the attorney's testimony was otherwise admissible,[18] it directly addressed the district court's concern that evidence of the time of preparation of exhibit C–11 was necessary to authenticate it

for admission. Admittedly, the testimony could have been clearer in that it did not explicitly state that exhibit C–11 was created as of a certain date, but the attorney nevertheless related that exhibit C–11 was given to him by Shanks, and that Shanks stated that he changed the figures on the document prior to the issuance of the policy. If the jury chose to believe the attorney's testimony on this score, it could have reasonably concluded that exhibit C–11 was prepared prior to the submission of the insurance applications.

The district court implied that the testimony of someone present at the time of creation of the document was necessary for authentication. [Rec. 1284]. While that certainly is one manner of authentication, *see* Notes of Advisory Committee, *Fed.R. Evid.* Rule 901(b)(1) (testimony of witness present at the signing of a document is one acceptable form of authentication), that method of authentication simply is not available in many cases. Rather, a document also may be authenticated by circumstantial evidence. *See e.g., United States v. Sutton,* 426 F.2d 1202, 1207 (D.C. Cir.1969). The two attorneys testified that exhibit C–11 was in existence at least as of

---

pared prior to the spring of 1981. If so, the trial court abused its discretion in excluding that documentary evidence.

**17.** The attorney from Jesup, Mr. Leaphart, testified as follows:

DIRECT EXAMINATION

Q: [Caldwell's counsel]: Mr. Leaphart, I believe the question was referring to document C–11. Did Mr. Shanks—I believe the question was—I will be corrected I am sure if I am changing the question. Did Mr. Shanks say anything to you about changing any figures relative to that document?

A: Yes, sir.

Q: What did he say?

A: He said he changed the value as it appears on the document from $60,000 to $95,-000.

Q: Did he say why?

A: He said that he made application for $45,000 worth of insurance. His insurance agent told him that they would not issue a policy for $45,000, that they would for $95,-000, and for him to get a survey showing $95,000, showing that value.

\* \* \* \* \* \*

CROSS EXAMINATION

Q: Mr. Leaphart, do you have any idea when Mr. Shanks was talking about all this happened?

A: When what happened, sir?

Q: When he had these conversations with Mr. Deason that caused him to change the survey?

A: Right around the time—shortly before the policy was issued.

Q: Okay.

A: I can't remember exactly when it was, but it was during that time. He made an application to Deason or made an application for a policy of insurance on this boat for a certain amount, and Deason communicated back to him that he would insure it for $95,-000, and for him to get a survey showing that, and that was shortly before the policy was issued, I think. I can't remember the exact date the policy was issued.

[Rec. 1431–33].

**18.** The government objected to any such testimony on the grounds of hearsay. Caldwell offered the testimony under Fed.R.Evid. 801(d)(2), as the admission of a party opponent, Shanks. The trial court overruled the objection. [Rec. 1431].

late 1982 or early 1983, almost two years prior to this trial, and that Shanks admitted authorship. Their testimony was bolstered by both Caldwell's identification of Shanks' handwriting and the circumstantial relationship between exhibits C–9, C–10 and Deason 2, all of which admittedly were in existence in the spring of 1981 and which indicate a chronological progression that would also place exhibit C–11 in existence at that time. This testimony and these circumstances constituted evidence that exhibit C–11 was what Caldwell purported it to be, and we are convinced that this is the type of evidence of authentication that Rule 901 deems sufficient for establishing a *prima facie* case for admissibility. *Cf. United States v. American Radiator & Stand. San. Corp.*, 433 F.2d 174, 192 (3d Cir.1970) (evidence of location where notes were found and lay identification of handwriting constituted sufficient evidence of the notes' author to authenticate them for admission), *cert. denied*, 401 U.S. 948, 91 S.Ct. 929, 28 L.Ed.2d 231 (1971); *Koziy*, 728 F.2d at 1321 (admission of documents was proper where one expert witness testified that the documents were similar to other genuine documents of that type which he had seen and another expert testified that the documents were not executed after a certain date). This is particularly true in light of the government's admission that the only person who could have definitively dated this document was Shanks, who was dead by the time the appellant located the document. [Rec. 1282]. In the absence of any evidence of fabrication, *see supra* note 16, we conclude that the district court improperly failed to admit exhibit C–11 into evidence for lack of authenticity. This result comports with the function of Rule 901, which makes the court's determination of authenticity merely a preliminary evaluation and leaves the ultimate decision on genuineness to the jury.

■ Having concluded that the trial court improperly excluded this documentary evidence, however, our inquiry is not complete. The harmless error doctrine operates in the realm of the admissibility of evidence, and "where the trial judge erroneously excluded evidence, we must first determine what the evidence would have been and then determine whether the trier of fact would have found the defendant guilty beyond a reasonable doubt with the additional evidence inserted." *United States v. Lay*, 644 F.2d 1087, 1091 (5th Cir.), *cert. denied*, 454 U.S. 869, 102 S.Ct. 336, 70 L.Ed.2d 172 (1981). Here, the only evidence that was excluded was exhibit C–11, and there is no dispute as to its contents. After an examination of the record as a whole, we are convinced beyond any reasonable doubt that the exclusion of this one fragment of evidence would not have altered the jury's verdict.

We find particularly significant the fact that although the document was not actually received into evidence, it was nevertheless repeatedly referred to throughout the testimony of the two attorneys from Jesup. They both identified the document as having been given to them by Shanks and as bearing handwritten alterations made by him. They also testified regarding his statements concerning altering the marine survey submitted on the *Our Way* at the direction of his insurance agent. Caldwell also testified as recognizing Shanks' handwriting on the document. In short, this testimony indicates that although the document itself did not make its way before the jury, the appellant's theory regarding the document was fully aired at trial. Appellant's counsel was able to fully and effectively argue in his closing argument that Shanks had been the one who altered the marine survey, not the appellant. *Cf. United States v. Ashley*, 555 F.2d 462, 465 (5th Cir.) (no need to review lower court's decision to exclude evidence, where "the substance of the desired testimony was, in fact laid before the jury"), *cert. denied sub nom.*, 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977).

Furthermore, exhibit C–11 did not go to the heart of the appellant's defense as he contends, but rather it merely played a minor corroborative role in that it was consistent with the testimony of the two attorneys from Jesup that Shanks told them

that he altered the marine survey before it was submitted to the insurance companies. The key to Caldwell's defense was not only that Shanks altered the marine survey before submitting it, but also that Caldwell had no knowledge of that alteration. But the attorneys did not testify that Shanks told them anything regarding Caldwell's knowledge or involvement. Exhibit C–11, therefore, was only corroborative on a point that was collateral to the necessary focus of Caldwell's defense. In light of the fact that the improperly excluded exhibit was just a minor piece of corroborative evidence that did not prevent the appellant from fully presenting his defense to the jury and that the substance of the evidence was before the jury, we find that the lower court's erroneous evidentiary ruling in this regard was harmless error.

### C. *The Mail Fraud Jury Instruction*

In relation to the mail fraud counts pending against the appellant, the trial court charged the jury with an instruction generally comporting with the recently issued Eleventh Circuit Criminal Pattern Instruction for mail fraud.[19] That instruction, in essence, informs the jury that the use of the U.S. mails must be "closely related" to the fraudulent scheme "in that the accused either mailed something or caused it to be mailed in an attempt to execute or carry out the scheme."[20] Appellant had requested an instruction that the "proof must show that the use of the United States Mail played an 'integral' rather than incidental or tangential role in the fraudulent scheme."

We note at the outset that Caldwell contends that there are two lines of binding authority in this circuit that conflict as to the degree of involvement the U.S. mails must play in a fraudulent scheme to constitute mail fraud. Under one line of authority cited by the appellant to the district court, the use of the mails must be "integral," rather than "incidental" or "tangential," to the scheme. *See United States v. Hewes*, 729 F.2d 1302, 1322 (11th Cir.1984), *cert. denied sub nom.*, —— U.S. ——, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985); *United States v. Bosby*, 675 F.2d 1174, 1183 (11th Cir.1982); *United States v. Kent*, 608 F.2d 542, 546 (5th Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980). Under the other line of authority, the mailing itself need not be essential to the scheme, so long as it is "incidental to an essential part of the scheme." *See United States v. Haimowitz*, 725 F.2d 1561, 1571 (11th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984); *United States v. Martino*, 648 F.2d 367, 394 (5th Cir.1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982); *United States v. Green*, 494 F.2d 820, 823–24 (5th Cir.), *cert. denied*, 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280 (1974). While we recognize the *apparent* inconsistency between these lines of decision, we nevertheless conclude that the district court properly charged the jury on the mail fraud counts for two reasons.

First, assuming for the moment that the line of authority requiring the use of the mails to be "integral" is definitive, as appellant argues, we nevertheless find that he has demonstrated no error in the charge

---

**19.** *See* Pattern Jury Instructions (Criminal Cases), Committee on Pattern Jury Instructions, Eleventh Circuit, Offense Instruction No. 34, Mail Fraud (A.O. Publication 1985).

**20.** The full instruction given reads as follows: It is not necessary that the Government prove all of the details alleged in the indictment concerning the precise nature and purpose of the scheme or that the material mailed was itself false or fraudulent, or that the alleged scheme actually succeeded in defrauding anyone, or that the use of the mail was intended as the specific or exclusive means of accomplishing the alleged fraud. What must be proved beyond a reasonable doubt is that the accused knowingly and willfully devised or intended to devise a scheme to defraud substantially the same as the one alleged in the indictment, and that the use of the U.S. Mail was closely related to the scheme in that the accused either mailed something or caused it to be mailed in an attempt to execute or carry out the scheme.

To cause the mails to be used is to do an act with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen.

given. The jury here was instructed that the use of the mails must be "closely related" to the fraudulent scheme, rather than "integral" to the scheme. While "closely related" to the scheme and "integral" to the scheme are not perfectly symmetrical, they nonetheless are so similar that neither we nor any reasonable juror could find an appreciable distinction between the two. This is especially true under the facts as developed in this case. The mailings of the marine survey and insurance applications are of the ilk that repeatedly have been found sufficient in cases under § 1341 in the past. *See, e.g., Haimowitz*, 725 F.2d at 1571 (in scheme whereby defendant sought to obtain a liquor license for a client he knew was not qualified to receive it, mailings of false liquor license applications upon which the scheme was based between different offices of the Florida Department of Beverage were sufficient); *Bosby*, 675 F.2d at 1183 (as part of scheme to defraud banks and stores by depositing uncollectible checks and withdrawing funds before those checks were returned, use of mails to have personalized checks sent to local addresses to give the new accounts the appearance of legitimacy satisfied the statute). Therefore, assuming *arguendo* that § 1341 requires the mailing to be "integral" to the fraudulent scheme, there simply was no error in stating instead that the mailing must be "closely related" to the fraud.

Second, it appears that the inconsistency noted above is more apparent than real. Many of the decisions reviewed by this court contain various descriptions of the mail use requirement in an attempt to articulate that element of the mail fraud statute. For example, in *Kent*, the court described the statutory element as satisfied "if the use of the mails was 'an integral part of the scheme to defraud,'" but later described the statute as also satisfied where "the thing mailed was an integral part of execution of the scheme so that the use of the mails was in this way 'incident to an essential part of the scheme.'" 608 F.2d at 546 (citations ommitted). In *Bosby*, the court stated that proof of the use of the

mails must be "integral" to the fraudulent scheme, 675 F.2d at 1183, but went on to note that "the use of the mails must simply contribute in some consequential manner to the success of the scheme." *Id.* at 1183 n. 16.

In short, we view the decisions cited to this court as factually consistent despite the semantic difficulties inherent in attempting to describe the degree of mail involvement necessary under the mail fraud statute. Rather than attempting to articulate our own formulation of that requirement—culminating in a result that we suspect would be no more illuminating than previous efforts—we deem it preferable to look for guidance from the Supreme Court's most recent pronouncement in this area. In *United States v. Maze*, 414 U.S. 395, 399–400, 94 S.Ct. 645, 647–48, 38 L.Ed.2d 603 (1974), the Court framed the question as "whether these mailings were sufficiently closely related to respondent's scheme to bring his conduct within the statute." Under the statute, the mailing must be "for the purpose of executing the scheme," *id., quoting Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), and "one 'causes' the mails to be used where he 'does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'" *Id., quoting Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954). *Maze* involved a situation where the defendant had stolen a credit card and charged items on it. He was indicted for mail fraud, and the use of the mails that was alleged in the indictment was the mailing of the charge slips from the stores to the bank that issued the card and the mailing in turn of those slips by the bank to the cardholder. The *Maze* Court found that these mailings were insufficient under § 1341, noting that the purpose of those mailings was to adjust the accounts of the bank and the cardholder. The Court noted that the fraudulent scheme reached fruition once the charges had been made, and

that the mailings had nothing to do with the ultimate success of the fraudulent scheme. *Id.*, 414 U.S. at 402, 94 S.Ct. at 649.

Leaving the "integral/incidental" terminology aside, the instruction given here comports exactly with the law as set out in *Maze.* Here, the defendants could not have obtained insurance coverage without the transmission of the insurance applications and the marine survey between the insurance companies, nor could they have requested reimbursement for their loss without submitting a loss notice. Those submissions were necessary to the success of the fraudulent schemes, and the mailings, which temporally occurred in the midst of the schemes, undoubtedly could be foreseen as necessary in the course of business in processing the applications and the loss claim. As such, the mailings, even though they were between the insurance companies, clearly were "closely related" to the schemes to defraud. We therefore give our approval to the district court's instruction, as well as the new Eleventh Circuit Pattern Jury Instruction on criminal mail fraud, and find no error in the mail fraud charge given the jury in this case.

### D. *Failure To Grant Appeal Bond*

██ Appellant contends that the district court erred in failing to grant his request for bond pending appeal. We find no need to review the district court's decision reported at 605 F.Supp. 260 (N.D.Ga.1985). Even if error were found, there is no relief available to appellant at this stage of the proceedings in light of our affirmance of his convictions. We do note that there is no merit in the appellant's contention that application of the Bail Reform Act of 1984, 18 U.S.C. § 3143, violated the prohibition against *ex post facto* laws. *United States v. Ballone,* 762 F.2d 1381 (11th Cir.1985).

### V. CONCLUSION

We have reviewed the appellant's four primary issues raised on appeal and have found no error committed below that would garner reversal.[21] As to the district court's investigation of the anonymous allegation of juror misconduct, the failure to allow the appellant to be present at the investigation of the accused juror was harmless error under Rule 43, and no further investigation than undertaken was required under these unique circumstances. The failure to admit exhibit C–11, the Baxley marine survey with handwritten notations, was harmless error. The appellant's challenge to the mail fraud jury instruction has no merit, as the charge given by the district court correctly stated the "use of the mails" element of the offense. And, finally, we find the appellant's contentions in regard to the district court's application of the Bail Reform Act to be meritless.

AFFIRMED.

---

**21.** We note that the government has urged application of the concurrent sentence doctrine in this case due to the concurrent 30 month sentences given on all counts. Under that doctrine of judicial convenience, the merits of a challenge to one count will not be reached where the conviction on another count is valid, so long as no collateral consequences will flow from the challenged conviction if it is left unreviewed. *See, e.g., United States v. Fuentes-Jimenez,* 750 F.2d 1495, 1497 (11th Cir.1985). At oral argument, it was pointed out to government counsel that one practice under the concurrent sentence doctrine has been to vacate the judgment of conviction on the counts not reviewed. *See, e.g., United States v. Butera,* 677 F.2d 1376, 1386 (11th Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983). In light of that possibility, the government was no longer as adamant in its position that no collateral adverse consequences would stem from the multiple convictions. We recognize that the practice in this circuit has not been consistent. *See, e.g., Fuentes-Jiminez,* 750 F.2d at 1497 (applying the doctrine and affirming the conviction on count not reviewed). But the government's position on whether adverse consequences may actually follow in this case apparently depends upon whether this court chooses to affirm or vacate the unreviewed convictions. In light of that fact and the government's failure to present any evidence such as parole guidelines to support the application of the doctrine, we fail to find a sufficient record to justify the exercise of our discretion to apply the concurrent sentence doctrine.